# EXHIBIT 4

**TERM SHEET
FOR SERIES A PREFERRED SHARES INVESTMENT IN
GROUNDTRUTH LIMITED
13 FEBRUARY, 2018**

This term sheet ("**Term Sheet**") describes, for negotiation purposes only, some key terms of a possible investment by a special purpose vehicle created and managed by C5 Capital on behalf of third party investors ( "**C5C**") in certain shares of **GroundTruth Limited** (the "**Company**"). The Company is being spun-off from the **Peacetech Labs** ("**PTL**", each of C5C, PTL and the Company, a "**Party**", collectively the "**Parties**").

**Non-Binding – For Discussion Purposes Only**

This Term Sheet is non-binding and is intended solely as a summary of the terms that are currently proposed by the Parties provided that in consideration of C5C issuing this Term Sheet the Company and the other Parties hereby agree that this paragraph, the paragraph immediately below entitled "Confidentiality" and the paragraph[s] entitled "Exclusivity" and "Governing Law" shall be legally binding and enforceable. Except as specified in the previous sentence, a binding agreement will not occur until the execution of definitive agreements and any Party may, at any time prior to the execution of such definitive agreements, propose additional terms, different terms or terminate all negotiations for any reason and without any liability to any other Party. Except as set out in this Term Sheet, each Party shall be liable for all of its own costs and expenses.

**Confidentiality**

The terms and conditions set out in this Term Sheet, including its existence, shall be confidential information and shall not be disclosed by any Party to any third party except to its employees and/or its financial or legal advisors in each case who have a need to know and have previously agreed to keep this information confidential (each a "**Permitted Recipient**"). Each Party shall be liable for any breach by any of its respective Permitted Recipients.

**Offering Terms**

| | |
|---|---|
| *Closing Date:* | As soon as practicable following satisfaction of the conditions to Closing (the "Closing"). |
| *Amount Raised and Use of proceeds* | $3,000,000. |
| | The amount raised shall be used by the Company for general business purposes In support of the business plan to be agreed with C5C. |
| *Share Type:* | Series A Preferred Shares in the Company (as defined below) ("**Series A Preferred Shares**"). |
| *Investors:* | C5C: [2,166,429] Series A Preferred Shares for total investment of $3,000,000 (the "**Investor**") |
| *Price Per Share:* | $ [1.3848] per Series A Preferred Share (the "**Original Purchase Price**") based upon a fully-diluted pre-money valuation of $7,000,000 and a fully diluted post-money valuation of $10,000,000. |

1

|  |  |
|---|---|
|  | The Original Purchase Price has been calculated using the total amount of fully diluted share capital prior to the signing of definitive investment agreements (including any options, warrants or other commitments to issue shares) and assuming that immediately prior to the signing, [1, 083,214] shares will be added to the newly created option pool creating an unallocated option pool of [1, 083,214] shares. |
| Target Entity | C5C will invest in a new holding company to be formed by PTL and incorporated in Delaware, USA prior to Closing on such terms as shall comply with this Term Sheet and are satisfactory to C5C ("**HoldCo**"). The existing shareholders shall contribute their shares in the Company to HoldCo in consideration for shares in HoldCo. |
|  | The PTL will commit to grant a royalty-free, exclusive, perpetual license to the Company for any relevant IP they may have as of the date of license grant that might be relevant for the Company in order to conduct business and achieve its business plan. The PTL will retain the ability to use the IP for charitable purposes. The PTL will receive, at close, $300,000 from the Company. For the avoidance of doubt, in case the Company is acquired, this license will still be in place and maybe transferred to the acquiring entity. |
|  | The PTL will also enter into an arms-length office rental [ and services – scope and pricing to be discussed] agreement with the company for a minimum period of two years. Terms of this agreement to be agreed with C5 prior to close. |
| *Capitalization:* | The Company's capital structure immediately before and after the Closing is set out in **Annex 1**. |
| *Existing shares:* | The terms set forth below for the Series A Preferred Shares are subject to a review of the rights, preferences and restrictions for the existing share capital. |
|  | Please note that the types of shares/structure will be revised by during documentation in an effort to achieve a tax neutral position to the individuals involved. |
| *Key Employees:* | [Rohini Srihari & Sheldon Himelfarb] (the "**Key Employees**") |
| *Conditions to Closing:* | Standard conditions to Closing which shall include satisfactory completion of due diligence; the filing of amended articles or equivalent; and an opinion of counsel to the Company. |
| *Dividends:* | No dividends shall be paid unless all dividends on the Series A Preferred Shares have been paid in full. For any other dividends or distributions, Series A Preferred Shares will participate with Ordinary Shares on an as-converted basis. |
| *Liquidation Preference:* | In the event of any liquidation, dissolution or winding up of the Company, the proceeds shall be paid as follows: |
|  | First pay one times the Original Purchase Price plus declared and unpaid dividends on each Series A Preferred Share (the "Preference Amount"). Thereafter, Series A |

Preferred Shares participate with Ordinary Shares on an as-converted basis until the holders of Series A Preferred Shares receive an aggregate of 2 times the Original Purchase Price.

A trade sale, merger, acquisition, change of control, consolidation, or other transaction or series of transactions (other than one in which shareholders of the Company own a majority by voting power of the outstanding shares of the surviving or acquiring corporation) and a sale, lease, transfer, exclusive license or other disposition of all or substantially all of the assets of the Company will be treated as a liquidation event, thereby triggering payment of the liquidation preferences described above.

If the Company has insufficient assets to permit payment of the Preference Amount in full to all holders of Series A Preferred Shares, the assets of the Company shall be distributed rateably to the holders of the Series A Preferred Shares in proportion to the Preference Amount each holder would otherwise be entitled to receive.

| | |
|---|---|
| *Redemption:* | At any time after the 5th anniversary of the Closing, each of the Series A Preferred Shares are redeemable following the request of the holders of at least 75% of the Series A Preferred Shares at the higher of cost plus all accrued but unpaid dividends and the then prevailing market value. |
| *Conversion:* | The Series A Preferred Shares initially convert 1:1 to Ordinary Shares at any time at the option of holder, subject to adjustments for subsequent changes in share capital. Each Series A Preferred Share will automatically be converted into Ordinary Share(s) at the then applicable conversion rate on a Qualified IPO (*note: to be defined in investment documents*). |
| *Anti-dilution Provisions:* | In the event that the Company issues additional securities at a purchase price less than the Original Purchase Price, the Company shall issue to each Investor an additional number of Series A Preferred Shares (at no cost or, where not legally permissible, for nominal value) in order to implement a broad based weighted average anti-dilution protection. |
| | Certain issues of share capital will not trigger such an adjustment, for example issues of shares under an employee share option plans previously approved by Investors. |
| *Right to Participate Pro Rata in Future Rounds:* | All Investors shall have a pro rata pre-emption right, based on their percentage equity ownership in the Company (on an as converted basis), to participate in subsequent issuances of equity securities of the Company (subject to certain customary exclusions |
| *Protective Provisions* | The Company will not, without the written consent of the holders of at least [50]% of the Company's Series A Preferred Shares, do any of the matters set out in **Annex 2** either with respect to itself or, where applicable, with respect to any subsidiary. |
| *Board of Directors:* | Following Closing, the Board shall consist of [5] members being: |

(i) a representative designated byC5C, who at Closing shall be [ TBD ] (the "**Series A Director**");

3

    (ii)  a representative designated by the Key Employees or PTL, who at Closing shall be Sheldon Himelfarb;

    (iii) the person then serving from time to time as the Chief Executive Officer of the Company (Rohini Srihari);

    (iv) One person who is not employed by the Company and who is designated by the Key Employees (or PTL) and acceptable to C5C. This person needs to have specific domain knowledge in the market segments the Company will compete in (the "**Industry Expert Director**"). C5C's acceptance is not to be unreasonably withheld.

    (v) One person who is not employed by the Company and who is designated by C5C and acceptable to the Key Employees (or PTL), whose acceptance is not to be unreasonably withheld (The "**Independent Director**").

The Board shall appoint the Industry Expert Director as Chairman. In the event of deadlock the Chairman shall not have a casting vote.

*Board Matters:*   The Board of Directors shall meet at least eight times per calendar year, unless otherwise agreed by a vote of the majority of Directors. No more than 4 of these meetings can be structured as conference calls.

The Company will reimburse the international airplane ticket expense of any C5C nominated Board member, related either to travel to Board and committee meetings, or to any other travel undertaken at the Company's request.

The Company will put in place D&O insurance with an insurer and in an amount satisfactory to C5C

*Management and Information Rights:*   The Company will deliver to each Investor (i) annual, and quarterly financial statements, and such other information as C5C may from time to time reasonably request; (ii) thirty days prior to the end of each fiscal year, a comprehensive operating budget forecasting the Company's revenues, expenses, and cash position on a month-to-month basis for the upcoming fiscal year; and (iii) promptly following the end of each quarter an up-to-date capitalization table, certified by the CFO.

Subject to any restrictions under the relevant law, the Investors shall have, at reasonable times and upon reasonable notice, full access to all books and records of the Group.

*Non-Disclosure and Rights Assignment:*   Prior to Closing each current and former Key Employee, employee and consultant with access to Company confidential information/trade secrets will enter into a non-disclosure and proprietary rights assignment agreement in a form reasonably acceptable to the Investor.

*Representations, warranties and covenants:*   Customary representations, warranties and covenants by the Company, the PTL, and the Key Employees. Special C5C exit rights in case of breach of anti- bribery and export compliance covenants.

4

| | |
|---|---|
| *Restrictive covenants:* | Founders and senior managers to be subject to non-competition and non-solicitation clauses, including prohibition on making outside investments in competing businesses. |
| *Key Employees /Management Stock:* | Key Employees and managers shall not sell or otherwise transfer any of their shares in the Company without the prior approval or written consent of the Board of Directors including the Series A Director.

The Key Employees or any ordinary shareholder proposing to transfer shares shall give a right of first refusal and co-sale right to the holders of Series A Preferred Shares on a proposed transfer.

A Key Employee and/or manager who enters a bankruptcy process must offer to sell all his shares to all other shareholders at the then market value. |
| *Employee Stock Options:* | All employee options in any future Company stock option plan are to vest over a 4 year period with 25% vesting after one, and the remaining amount vesting monthly over the next 36 months. |
| *Transfers by C5C:* | C5C shall be free to sell and transfer its shares without any restrictions. |
| *Tag-along:* | All shareholders to have tag along right on same terms in the event that a transfer of any shares by one or more shareholders would result in a change of control - provisions in the paragraph headed "*Liquidation Preference*" to apply to distribution of sale proceeds. |
| *Drag-along:* | If the holders of a majority of the existing issued Shares, which is to include C5C if the exit proceeds imply a cash on cash return for the Series A Preferred Shares lower than 3X, accept a bona fide arms' length offer for their shares they can require all other shareholders to sell all their shares to the proposed buyer on the same terms save that the provisions in the paragraph headed "Liquidation Preference" shall apply in the distribution of sale proceeds. |
| *Exit opportunities:* | C5C will not give warranties or indemnities on a sale or IPO (except as to title and capacity). |
| *Registration Rights:* | The Company shall covenant that, in the case of a public offering on a stock exchange in the United States of any equity in the group, it will enter into a Registration Rights Agreement with the Investors upon customary terms and subject to Delaware Law. |
| *Counsel and Expenses:* | C5C's counsel to draft definitive investment agreements. The Company is to reimburse, at Closing, C5C for their expenses (whether external or internal) arising in connection with the transactions contemplated by this Term Sheet, subject to a cap of [$ ]. |
| Exclusivity: | From the date hereof until 31 March, 2018, the Company and the PTL shall not accept any agreement with any third party concerning a possible equity investment or loan or other type of funding of the Company |

*Governing Law:*      This Term Sheet is governed by English law.

- Remainder of page intentionally left blank -

We hereby agree to the terms of this Term Sheet

| C5C | PeaceTech Lab, Inc. |
|---|---|
| By......*[signature]*...... | By......*[signature]*...... |
| Name...Andre Pienaar...... | Name.SHELDON HIMELFARB |
| Title...Founder...... | Title..CEO      2/13/18 |
|  |  |

*Term Sheet Signature Page*

## Annex 1

## Company capital structure immediately before and after Closing

**Spin Out Cap Table**

| Shareholder | Common | Series A Pref | Total Issued | % Issued | ESOP | Total Fully Diluted | % Fully Diluted |
|---|---|---|---|---|---|---|---|
| CEO (Key Employee 1) | 577,714 | | 577,714 | 15% | | 577,714 | 15% |
| Director (Key Empl 2) | 361,071 | | 361,071 | 9% | | 361,071 | 9% |
| PeaceTech Lab | 3,033,000 | | 3,033,000 | 76% | | 3,033,000 | 76% |
| C5C | | | | | | | |
| ESOP Allocated | | | | | | | |
| ESOP Remaining | | | | | | | |
| Total | 3,971,786 | 0 | 3,971,786 | 100% | 0 | 3,971,786 | 100% |

**Pre-Money Cap Table**

| Shareholder | Common | Series A Pref | Total Issued | % Issued | ESOP | Total Fully Diluted | % Fully Diluted |
|---|---|---|---|---|---|---|---|
| CEO (Key Employee 1) | 577,714 | | 577,714 | 15% | - | 577,714 | 11% |
| Director (Key Empl 2) | 361,071 | | 361,071 | 9% | | 361,071 | 7% |
| PeaceTech Lab | 3,033,000 | | 3,033,000 | 76% | | 3,033,000 | 60% |
| C5C | | | | - | | | |
| ESOP Allocated | | | | - | | | |
| ESOP Remaining | | | | - | 1,083,214 | 1,083,214 | 21% |
| Total | 3,971,786 | 0 | 3,971,786 | 100% | 1,083,214 | 5,055,000 | 100% |

**Post-Money Cap Table**

| Shareholder | Common | Series A Pref | Total Issued | % Issued | ESOP | Total Fully Diluted | % Fully Diluted |
|---|---|---|---|---|---|---|---|
| CEO (Key Employee 1) | 577,714 | | 577,714 | 9% | | 577,714 | 8% |
| Director (Key Empl 2) | 361,071 | | 361,071 | 6% | | 361,071 | 5% |
| PeaceTech Lab | 3,033,000 | | 3,033,000 | 49% | | 3,033,000 | 42.00% |
| C5C | | 2,166,429 | 2,166,429 | 35% | | 2,166,429 | 30% |
| ESOP Allocated | | | | 0% | | - | 0.00% |
| ESOP Remaining | | | | 0% | 1,083,214 | 1,083,214 | 15.00% |
| Total | 3,971,786 | 2,166,429 | 6,138,215 | 100% | 1,083,214 | 7,221,429 | 100% |

## Annex 2

### Protective provisions

1. Any amendment or replacement of its certificate of incorporation;
2. Any amendment of the rights of the Series A Preferred Shares;
3. Any increase in authorized or issued share capital or the grant or issue of any instrument convertible into share capital;
4. Any purchase, redemption, subdivision, consolidation, re-designation or other variation of share capital;
5. Any merger, consolidation, acquisition or similar transaction resulting in a change of control;
6. The sale of all or a significant part (> 15%) of the assets;
7. The acquisition of any shares or other securities of another company (other than a wholly owned subsidiary)
8. The acquisition of all or substantially all of another company's assets;
9. The assignment, licence, transfer, disposal of or creation of any security over any intellectual property except in the ordinary course of business;
10. Winding up or liquidation if the exit proceeds imply a cash on cash return for the Series A Preferred Shares lower than 3X;
11. Declaration or payment of a dividend;
12. The incurrence of indebtedness in excess of $50,000 other than in the ordinary course of business;
13. Any material changes in business plan;
14. Any initial public offering or listing of shares;
15. Any agreement giving a third party a preferential right to negotiate, make an offer or receive information in relation to an exit event;
16. Any related party transaction not described in the Business Plan;
17. Any change to the authorised number of directors;
18. The adoption of any new stock option plan or any change to any existing stock option plan (including the size) or the issue of any stock options other than through an option plan previously approved by shareholders
19. The grant of registration rights senior to or equal with the Series A Preferred Shares;
20. Any transaction outside the ordinary course of business other than on arms' length terms (unless set out in the business plan);
21. The establishment of any committee of the Board or any delegation of Board authority to a committee;
22. The grant of any power of attorney other than in the ordinary course of business;
23. The appointment, removal and/or replacement of the CEO, CFO, or COO or any material amendment to the terms of employment or the terms and conditions of any of them;
24. The entry into any employment or consultancy agreement which cannot be terminated by 3 months' notice or less without giving rise to a claim for damages or compensation.