**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PEACETECH LAB, INC.,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 20-922 (JDB)** |
| **C5 ACCELERATE LLC,** **et al.,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

Plaintiff PeaceTech Lab, Inc. is a nonprofit company headquartered in Washington, D.C. whose mission is to promote peace around the world through technology.  PeaceTech brings this suit against Andre Pienaar, an entrepreneur and venture capital investor, and several companies of which he is a founder, executive, owner, or board member—C5 Accelerate LLC, Pinard S.à.r.l., C5 Capital Ltd., C5 Holdings S.à.r.l., and GroundTruth Investor LLC—alleging breach of contract, promissory estoppel, breach of the implied covenant of good faith and fair dealing, and fraud. Specifically, PeaceTech's amended complaint alleges that Pienaar and his companies breached agreements to make large donations and confer other financial benefits on PeaceTech, causing PeaceTech to incur over $2,598,000 in costs and other damages.

Defendants have now moved to dismiss the claims against certain defendants for lack of personal jurisdiction and to dismiss PeaceTech's amended complaint in its entirety for failure to state a claim.  For the reasons stated below, the Court will dismiss PeaceTech's fair dealing and fraud claims for failure to state a claim, and will dismiss one of the breach of contract claims and the promissory estoppel claim against certain defendants.  The remaining claims will proceed to discovery.

1

**BACKGROUND**

I.     **Factual Background**

At the pleading stage, district courts accept as true a plaintiff's factual allegations, see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and thus the Court recites the facts as presented in plaintiff's complaint.

PeaceTech is a 501(c)(3) nonprofit based in Washington, D.C. that supports the development of technology aimed at maintaining peace. Am. Compl. [ECF No. 20] ¶¶ 19–20. In February 2017, Andre Pienaar, an entrepreneur and venture capital investor, signed a "Gift Agreement" on behalf of his family trust, Pinard S.à.r.l. ("Pinard"), in which Pinard pledged to donate $1.5 million to PeaceTech for the purpose of creating an accelerator program for organizations developing peacebuilding technologies. Id. ¶¶ 3, 32, 66–67. Pursuant to the agreement, PeaceTech granted Pinard exclusive naming rights to the space where the program would be operated. Id. ¶ 67. Pinard never paid any portion of the $1.5 million donation. Id. ¶ 68. As a result, PeaceTech incurred $1.2 million in construction costs and was forced to take out a $500,000 line of credit to cover expenses, resulting in charges of $43,722, plus $27,902 in interest for late payments to a construction vendor. Id. ¶¶ 69–71.

In April 2017, Pienaar signed a "Collaboration Agreement" with PeaceTech on behalf of C5 Accelerate (a D.C.-based limited liability company of which Pienaar is Managing Director) to collaborate on the same accelerator program. Id. ¶¶ 54, 73, 76. Under the Collaboration Agreement, PeaceTech would provide meeting space and otherwise support the accelerator program. Id. ¶ 73. In exchange, C5 Accelerate would make annual payments of at least $160,000 for PeaceTech's costs in supporting the program and give PeaceTech securities in entities developed through the program. Id. ¶¶ 73, 75. C5 Accelerate made the first required payment,

but although PeaceTech expended considerable resources to support the program, C5 Accelerate did not make any further payments or give PeaceTech any securities.  Id. ¶¶ 78–80.

In February 2018, Pienaar signed a "Term Sheet" on behalf of C5 Capital (a U.K. company with an office in Washington, D.C. of which Pienaar is Director) for a first round of funding of $3 million in a new entity PeaceTech created called groundTruth global, Inc. ("groundTruth").  Id. ¶¶ 12, 52, 63, 81, 84.  Pienaar also signed an agreement on behalf of GroundTruth Investor (a Delaware company created to facilitate investments in groundTruth) to invest $3.3 million in groundTruth.  Id. ¶¶ 14, 37, 85.  The closing documents were placed in escrow in July 2018 in anticipation of imminent closing, but Pienaar then told PeaceTech another round of due diligence was needed, and C5 Accelerate provided two advances to keep the groundTruth project afloat pending closing.  Id. ¶¶ 93–94, 97.  PeaceTech also agreed to cover groundTruth's expenses while awaiting funding.  Id. ¶¶ 106, 108.  Pienaar repeatedly told PeaceTech that C5 Accelerate was working to complete the transaction, but the investment was never completed and groundTruth ceased operations in October 2018.  Id. ¶¶ 96, 103–105, 110.

## II.    Procedural History

PeaceTech initially filed this lawsuit on April 7, 2020.  Compl. [ECF No. 1].  Following defendants' first motion to dismiss, PeaceTech filed an amended complaint on August 11, 2020. As amended, the complaint alleges five counts: (1) breach of contract against Pienaar and Pinard in connection with the Gift Agreement; (2) breach of contract against Pienaar, C5 Accelerate, C5 Holdings, and C5 Capital in connection with the Collaboration Agreement; (3) promissory estoppel against Pienaar, C5 Holdings, C5 Capital, and GroundTruth Investor in connection with the groundTruth investment; (4) breach of the implied covenant of good faith and fair dealing against all defendants; and (5) fraud against all defendants.  Am. Compl. ¶¶ 131–70.

Defendants have now moved to dismiss the claims against certain defendants for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and to dismiss the entirety of the amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Defs.' Mot. to Dismiss Am. Compl. [ECF No. 21] at 1–2.  That motion is fully briefed and ripe for consideration.

## LEGAL STANDARD

A defendant may move to dismiss an action for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  The burden is then on plaintiff to make a prima facie showing that the Court has personal jurisdiction over the defendant.  Mwani v. bin Laden, 417 F.3d 1, 7 (D.C. Cir. 2005).  "'Conclusory statements' . . . do not satisfy this burden."  Livnat v. Palestinian Auth., 851 F.3d 45, 57 (D.C. Cir. 2017).  "When deciding personal jurisdiction without an evidentiary hearing—as here—the court must resolve factual disputes in favor of the plaintiff," but "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts." Id. (citations and internal quotation marks omitted).

Similarly, when considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), courts presume the truth of a complaint's factual allegations, but "are not bound to accept as true a legal conclusion couched as a factual allegation."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotation omitted).  Courts then ask whether the facts alleged suffice "to state a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).  When "a complaint pleads facts that are 'merely consistent with' a defendant's liability," but goes no further, that complaint "stops short of the line between possibility and plausibility of entitlement to relief."  Id. (quoting Twombly, 550 U.S. at 557).  Under Rule 12(b)(6), courts consider "the facts alleged in the complaint, any documents either attached to or incorporated in

the complaint and matters of which [the court] may take judicial notice." Mpoy v. Rhee, 758 F.3d 285, 291 n.1 (D.C. Cir. 2014) (citation and internal quotation marks omitted).

## ANALYSIS

### I.     Vicarious Liability

In order to facilitate claims against defendants who are not parties to the relevant agreements, PeaceTech alleges that "[o]n information and belief, the corporate Defendants acted as alter egos of Mr. Pienaar." See Am. Compl. ¶¶ 49, 55. The Court finds that PeaceTech has sufficiently pled that Pinard acted as an alter ego of Pienaar, but not that the other corporate defendants were alter egos of Pienaar or each other.

Generally, under District of Columbia law, "the corporate entity and the natural persons who compose the corporation will be looked upon as separate and distinct until sufficient reason to the contrary appears." McAuliffe v. C & K Builders, Inc., 142 A.2d 605, 607 (D.C. 1958). However, "[u]nder the alter ego theory, the court may ignore the existence of the corporate form whenever an individual so dominates an organization 'as in reality to negate its separate personality.'" Founding Church of Scientology of Wash., D. C., Inc. v. Webster, 802 F.2d 1448, 1452 (D.C. Cir. 1986) (quoting Quinn v. Butz, 510 F.2d 743, 758 (D.C. Cir. 1975)). This Circuit has outlined "several factors" that are "helpful in deciding when to pierce the corporate veil," grouping them "under a two-prong test: (1) is there such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist?; and (2) if the acts are treated as those of the corporation alone, will an inequitable result follow?" Labadie Coal Co. v. Black, 672 F.2d 92, 96 (D.C. Cir. 1982). These factors include: "(1) the nature of the corporate ownership and control; (2) failure to maintain corporate minutes or adequate records; (3) failure to maintain the corporate formalities; (4) a commingling of funds and other assets; (5) diversion

of corporate funds or assets to other uses; and (6) use of the same office or business location." IMark Mktg. Servs., LLC v. Geoplast S.p.A., 753 F. Supp. 141, 150 (D.D.C. 2010).

Defendants argue that "the assertions by [PeaceTech] regarding vicarious liability are almost exclusively bare and conclusory allegations." Mem. in Supp. of Defs.' Mot. to Dismiss Am. Compl. [ECF 21-1] ("Mot. to Dismiss") at 13. "Although a plaintiff need not show at the pleadings stage . . . that which he needs to show to prevail at trial, the plaintiff must still allege sufficient facts regarding an alter ego relationship to satisfy Rule 8(a)(2) and Iqbal." Motir Servs., Inc. v. Ekwuno, 191 F. Supp. 3d 98, 110 (D.D.C. 2016) (quotation omitted). Analogizing to Kelleher v. Dream Catcher, L.L.C., 221 F. Supp. 3d 157 (D.D.C. 2016), defendants contend that PeaceTech has not alleged such facts. See Mot. to Dismiss at 13. In Kelleher, the plaintiff alleged that the defendants were alter egos because they shared an address, and that upon information and belief, "there is a unity of ownership and interest," the defendant "is and at all relevant times has been undercapitalized," "there has been extensive comingling and intermingling of assets between [the corporate and] individual defendants," the corporate defendant "has failed to observe corporate formalities," and "the individual defendants have utilized the company form . . . to perpetrate wrongful and fraudulent conduct." 221 F. Supp. 3d. at 159. Judge Mehta dismissed the alter ego liability claim for failure to state a claim, explaining that "these allegations are no more than threadbare recitals of the factors courts must consider in deciding whether the corporation is the alter ego of its shareholders" and "do not suffice to establish a plausible claim of alter ego liability." Id. (quotations omitted).

Defendants are correct that PeaceTech's statement that "[o]n information and belief, the corporate Defendants acted as alter egos of Mr. Pienaar," Am. Compl. ¶ 49, does not alone suffice to establish a plausible claim of alter ego liability. However, the Amended Complaint includes

specific facts demonstrating an alter ego relationship between Pienaar and Pinard—which go beyond the "threadbare recitals" in <u>Kelleher</u>. PeaceTech alleges not only that Pienaar owns Pinard, which is his family trust, Am. Compl. ¶¶ 15, 32, but that Pienaar used Pinard to make a pledge on behalf of himself, saying, "[t]he pledge is from me personally," <u>id.</u> ¶ 55. PeaceTech further alleges that the "Giving" section on Mr. Pienaar's personal website lists PeaceTech as one of the "charitable organisations" he <u>personally</u> supports—even though neither Pienaar nor Pinard has paid any amount of the pledged $1.5 million donation. <u>Id.</u> ¶ 57. These allegations suggest unity of interest and ownership between Pinard and Pienaar. PeaceTech also alleges that Pinard was de-listed from the Luxembourg Business Register between the filing of the original complaint and the amended complaint, and that such de-listing "might be related to this lawsuit and Defendants' attempts to avoid liability for their actions." <u>Id.</u> ¶¶ 52, 53. Thus, contrary to defendants' claim that PeaceTech has "not alleged . . . that each of the entities could not satisfy a judgment," Reply in Supp. of Defs.' Mot. to Dismiss Am. Compl. ("Defs.' Reply") [ECF No. 24] at 6, PeaceTech has alleged that Pinard may not "continue to exist," Am. Compl. ¶ 53, and thus that an "inequitable result" could follow "if the acts are treated as those of the corporation alone." <u>Labadie Coal Co.</u>, 672 F.2d at 96. To be sure, PeaceTech has not made allegations regarding many of the factors relevant to veil-piercing. But, taking PeaceTech's allegations as true, it has (just barely) pled sufficient facts to withstand a motion to dismiss. See <u>Lopes v. JetsetDC, LLC</u>, 994 F. Supp. 2d 135, 147 (D.D.C. 2014) ("The Court recognizes that plaintiff's pleaded facts in support of piercing the corporate veil are minimal, but the Court believes it is difficult for the plaintiff, at this stage, to obtain substantive information in support of his contention.").

But for the other corporate defendants, the Court concludes that PeaceTech has not pled sufficient facts to establish alter ego liability. PeaceTech alleges that Pienaar is Managing Director

of C5 Accelerate, founded and has ownership interest in C5 Capital, is a Manager of C5 Holdings, and created GroundTruth Investor.  See Am. Compl. ¶¶ 15, 52, 54, 58. And PeaceTech further alleges that the companies are closely held are all related. Id. ¶¶ 46, 48–49.  These facts alone, however, are insufficient to support alter ego liability.  As this Circuit has emphasized, "[a] corporation is 'viewed as a distinct entity, even when it is wholly owned by a single individual,'" and "the law takes seriously the formal line between a corporation and a natural person, even when the corporation is, in effect, a one-person firm."  Nat'l Sec. Counselors v. CIA, 811 F.3d 22, 31 (D.C. Cir. 2016) (quoting Quinn, 510 F.2d at 757).

Thus, the Court concludes that PeaceTech has sufficiently pled that Pienaar may be held vicariously liable for Pinard.  But PeaceTech has not sufficiently pled that Pienaar may be held liable for the other corporate defendants or that those corporate defendants may be held liable for each other.

## II.      Breach of Gift Agreement

PeaceTech's first claim for relief alleges that Pienaar and Pinard breached their contractual obligations to donate $1.5 million to PeaceTech under the Gift Agreement.  Am. Compl. ¶¶ 131–39.  To prevail on a claim for breach of contract, a plaintiff must allege: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; (4) damages caused by the breach."  Paulin v. George Wash. Univ. Sch. of Med. & Health Scis., 878 F. Supp. 2d 241, 246 (D.D.C. 2012).  At the Rule 12(b)(6) stage, however, a plaintiff need only "describe the terms of the alleged contract and the nature of the defendant's breach."  See Francis v. Rehman, 110 A.3d 615, 620 (D.C. 2015) (citing Nattah v. Bush, 605 F.3d 1052, 1058 (D.C. Cir. 2010).

Here, PeaceTech plausibly alleges that Pinard and PeaceTech both signed the Gift

Agreement, which stated that Pinard would donate $1.5 million to PeaceTech in exchange for naming rights and other recognition.  See Am. Compl. ¶¶ 66–67.  PeaceTech further alleges that Pinard never made the donation, breaching the contract.  Id. ¶ 68.  And PeaceTech alleges damages in the form of construction costs and other charges it amassed in expectation of receiving the donation.  Id. ¶¶ 69–71.

As an initial matter, defendants contend that Pienaar cannot be liable for breach of the Gift Agreement because he signed it only on behalf of Pinard, not in his personal capacity.  See Mot. to Dismiss at 19.  Of course, a non-party cannot be held liable for breach of contract merely because he owns a company that is party to the contract—even if that company is closely held.  See, e.g., Nelson v. Adams USA, Inc., 529 U.S. 460, 471 (2000) ("One-person corporations are authorized by law and should not lightly be labeled sham.").  But here, as explained above, PeaceTech has sufficiently pled that Pinard acted as an alter ego of Pienaar.  Thus, the Court will not dismiss PeaceTech's breach of Gift Agreement claim against Pienaar.

Defendants next argue that the Gift Agreement "does not satisfy the elements of an enforceable contract under Washington, D.C. law."  Mot. to Dismiss at 20–21.  The Court disagrees.  To begin with, defendants contend that, as a general matter, "[g]ifts are not enforceable contracts as, among [other] things, they lack obligations or duties of the parties, consideration, and potentially other legally necessary elements."  Id. at 20.  To be sure, outside the charitable giving context, "a mere promise to make a gift is unenforceable."  See Zoob v. Jordan, 841 A.2d 761, 765 (D.C. 2004).  But as PeaceTech correctly responds, "[c]ontracts for donations in exchange for naming rights are enforceable like any other contract."  See PeaceTech's Corrected Mem. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") [ECF No. 23] at 14.  For instance, Judge Kollar-Kotelly of this Court denied a motion to dismiss a donor's breach of contract claim where the donor alleged

that her donation was "payment in consideration for naming rights" for an office the donee planned to buy.  Klayman v. Judicial Watch Inc., 2007 WL 140978, at *8–9 (D.D.C. Jan. 17, 2007), vacated in part on other grounds, 2007 WL 1034936 (D.D.C. Apr. 3, 2007).  The court rejected the donor's argument that the donation was a gift, explaining that the donor had alleged it was payment in consideration for naming rights, and nothing more was required at the motion-to-dismiss stage.  Id. at *9; see also Tenn. Div. of United Daughters of Confederacy v. Vanderbilt Univ., 174 S.W.3d 98, 102 (Tenn. Ct. App. 2005) (finding a donation agreement in exchange for naming rights enforceable); Allegheny Coll. v. Nat'l Chautauqua Cty. Bank of Jamestown, 159 N.E. 173, 176 (N.Y. 1927) (finding agreement to provide naming rights sufficient to support a bilateral contract).[1]

Defendants also argue that the Gift Agreement is not enforceable because "it does not obligate the Plaintiff to do anything other than to agree to something in the future, subject to approval of a third party."  Mot. to Dismiss at 20; see also Defs.' Reply at 21–22.  The Gift Agreement states that Pinard "is hereby granted the sole and exclusive naming rights to the space in the Lab in which the C5 accelerator program will be operated."  Am. Compl. Ex. 1 ("Gift Agreement") [ECF No. 20-1] ¶ 4.  Further, the parties "agree that the facility will be named in honor of a person to be mutually agreed and acknowledge that the honoree and space name must be approved by the U.S. Institute of Peace (USIP).  [PeaceTech] agrees to use best efforts to obtain such approval."  Id.  Defendants contend that because the precise name is to be agreed upon later and must be approved by a third party, PeaceTech merely "agrees to agree at some future point,

---

[1] Even outside of naming rights agreements, courts typically enforce donation agreements.  See, e.g., Appalachian Bible Coll. v. Foremost Indus., 2018 WL 1811334, at *2–3 (M.D. Pa. Apr. 17, 2018) (granting summary judgment on breach-of-contract claim where defendant failed to make donations required by a gift agreement); Mass. Eye & Ear Infirmary v. Eugene B. Casey Found., 417 F. Supp. 2d 192, 196–98 (D. Mass. 2006) (denying motion to dismiss claim of breach of charitable pledge); William A. Drennan, Charitable Naming Rights Transactions: Gifts or Contracts?, 2016 Mich. St. L. Rev. 1267, 1289 (2016) ("[D]espite the general maxim that mere promises to give in the future are not legally enforceable, in the charitable arena, courts typically . . . enforce charitable pledges whether or not the charity will grant naming rights in exchange for the donation.").

with full veto rights by another party, leaving Pinard with only a hope and not a binding right." See Defs.' Reply at 22.  The Court is not persuaded.

"[T]o be enforceable, a contract must be sufficiently definite as to its material terms (which include, e.g., subject matter, price, payment terms, quantity, and duration) that the promises and performance to be rendered by each party are reasonably certain."  Affordable Elegance Travel, Inc. v. Worldspan, L.P., 774 A.2d 320, 327 (D.C. 2001) (quotation omitted).  The Gift Agreement meets this standard.  It includes "the subject matter of the contract (a donation in exchange for various consideration, including naming rights and other public recognition); the price ($1.5 million); payment terms (three equal installments); and duration (so long as the space is controlled by PeaceTech or USIP)."  See Pl.'s Opp'n at 15.  Although the precise name of the facility is subject to further agreement, PeaceTech's promise of naming rights is not illusory.  See Davis v. Joseph J. Magnolia, Inc., 640 F. Supp. 2d 38, 45 (D.D.C. 2009) ("[A] promise is illusory when performance of that promise is optional.").  The Gift Agreement states that PeaceTech "agrees to use best efforts to obtain such approval.  If the parties do not obtain such approval, they will consult with each other and with USIP on a replacement name."  Gift Agreement ¶ 4.  PeaceTech is not free to simply name the facility whatever it wants or to grant naming rights to a different donor. Rather, the Gift Agreement gives Pinard exclusive naming rights and PeaceTech must use "best efforts" to obtain approval for a name Pinard desires.  See Capitol Vial, Inc. v. Int'l Bioprods, Inc., 980 F. Supp. 628, 631 (N.D.N.Y. 1997) (promise to use best efforts "would appear to constitute a valuable form of consideration").

Moreover, the Gift Agreement imposes other obligations on PeaceTech.  For one, it requires PeaceTech to use the $1.5 million donation for a particular purpose: to develop space for an accelerator program.  Gift Agreement ¶ 3.  Courts have found that a promise "to use the gift for

an express purpose and not for any other purpose" "tend[s] to demonstrate that consideration was given for the gift."  See Mass. Eye & Ear Infirmary, 417 F. Supp. 2d at 197.  And the Gift Agreement obligates PeaceTech to recognize Pinard through a prominently displayed plaque, donor wall, website, and press releases.  See Gift Agreement ¶ 5.  Clearly, then, defendants are wrong that "Pinard loses control over the donation after it is made."  See Defs.' Reply at 22.

Hence, the Court will deny defendants' motion to dismiss PeaceTech's breach of Gift Agreement claim.

## III.   **Breach of Collaboration Agreement**

PeaceTech's second claim for relief alleges that Pienaar, C5 Accelerate, C5 Holdings, and C5 Capital breached their contractual obligation to give PeaceTech payments and equity under the Collaboration Agreement.  Am. Compl. ¶¶ 140–48.  PeaceTech alleges that C5 Accelerate and PeaceTech entered into an agreement requiring C5 Accelerate to make annual payments to support the accelerator program and give PeaceTech securities in entities developed in the program.  Id. ¶¶ 73, 75.  PeaceTech further alleges that C5 Accelerate breached the contract by failing to make all but one of the required payments, and by failing to provide any securities, even though PeaceTech "expended extensive efforts and resources to support the accelerator program" including by "us[ing] staff and contractors to recruit start-ups for the accelerator, recruit mentors and coaches to support the program participants, and provide support for daily operations."  Id. ¶¶ 73, 74, 78, 80.  Finally, PeaceTech alleges that it suffered damages when C5 Accelerate failed to compensate PeaceTech for supporting the accelerator.  Id. ¶¶ 147–48.

To start, defendants argue that Pienaar, C5 Holdings, and C5 Capital are not liable for breach of the Collaboration Agreement.  Mot. to Dismiss at 21–22.  PeaceTech never alleges that Pienaar was a party to the Collaboration Agreement, only that "C5 Accelerate entered into a

Collaboration Agreement with PeaceTech" and "Mr. Pienaar signed the agreement on behalf of C5 Accelerate." Am. Compl. ¶¶ 73, 76. And as explained above, a non-party cannot be held liable for breach of contract merely because he owns a company that is party to the contract. Similarly, PeaceTech's only allegation as to why C5 Holdings and C5 Capital are bound by the Collaboration Agreement is the bare assertion that, "[o]n information and belief, C5 Accelerate acted as an agent of C5 Holdings and C5 Capital for relevant purposes." Id. ¶ 142. Because, as explained above, PeaceTech has not sufficiently pled alter ego liability, the Court will dismiss PeaceTech's breach of Collaboration Agreement claim against Pienaar, C5 Holdings, and C5 Capital.

Next, defendants contend that the claim against C5 Accelerate should be dismissed because PeaceTech "has not demonstrated any harm with respect to an alleged breach" and instead "has received only benefits." Mot. to Dismiss at 22. Specifically, defendants argue that the Collaboration Agreement provides for C5 Accelerate's annual contributions "to be applied by PeaceTech to its staff costs in support of the work of [C5 Accelerate]," but the Complaint "provides no allegation that the Plaintiff incurred any cost at all in supporting C5 Accelerate." See id. at 22–23; Am. Compl. Ex. 2 ("Collaboration Agreement") [ECF No. 20-2] ¶ 4(c). Rather, defendants argue, PeaceTech received the first $160,000 payment from C5 Accelerate without supporting the work of C5 Accelerate, and so has been unjustly enriched.

The Court disagrees. To be sure, "a wrong which results in no loss or damage . . . cannot sustain an action" for breach of contract. Tsintolas Realty Co. v. Mendez, 984 A.2d 181, 187 (D.C. 2009). But PeaceTech does allege that it incurred costs in supporting C5 Accelerate's work in starting the accelerator program. The Amended Complaint alleges that PeaceTech "expended extensive efforts and resources to support the accelerator program," "used staff and contractors to recruit" participants and support daily operations, and "used its own networks and marketing

channels to raise the accelerator's profile." See Am. Compl. ¶ 78.  Although PeaceTech does not specifically allege that these expenditures cost more than $160,000, its allegations are sufficient to survive a motion to dismiss.  See, e.g., DC2NY, Inc. v. Acad. Bus, LLC, Civ. Action No. 18-2127 (RC), 2020 WL 1536219, at *12 (D.D.C. Mar. 31, 2020) (denying motion to dismiss where alleged damages were lost profits); Francis, 110 A.3d at 620 ("[T]o survive a Rule 12(b)(6) motion to dismiss, it is enough for the plaintiff to describe the terms of the alleged contract and the nature of the defendant's breach") (citing Nattah v. Bush, 605 F.3d 1052, 1058 (D.C. Cir. 2010))).

Hence, the Court will deny defendants' motion to dismiss PeaceTech's breach of Collaboration Agreement claim against C5 Accelerate, but will dismiss the claim against Pienaar, C5 Holdings, and C5 Capital.

## IV.   **Promissory Estoppel**

PeaceTech's third claim for relief alleges promissory estoppel against Pienaar, C5 Holdings, C5 Capital, and GroundTruth Investor in connection with the groundTruth investment. Am. Compl. ¶¶ 149–55.  "To survive a Rule 12(b)(6) motion for failure to state a claim of promissory estoppel, a plaintiff 'must show (1) a promise; (2) that the promise reasonably induced reliance on it; and (3) that the promisee relied on the promise to his or her detriment.'" See Greggs v. Autism Speaks, Inc., 987 F. Supp. 2d 51, 55 (D.D.C. 2014) (quoting In re U.S. Office Prods. Co. Sec. Litig., 251 F. Supp. 2d 77, 97 (D.D.C. 2003)).

PeaceTech alleges that C5 Capital and PeaceTech signed a (non-binding) Term Sheet for a $3 million first round of funding for groundTruth (a new entity created by PeaceTech) and that Pienaar signed on behalf of C5 Capital.  Am. Compl. ¶¶ 81, 84; Am. Compl. Ex. 3 [ECF No. 20-3] at 1.  Pienaar also signed an agreement on behalf of GroundTruth Investor to invest $3.3 million. Id. ¶ 85.  After the closing documents were placed into escrow in anticipation of imminent closing,

Pienaar said more due diligence was needed, but that he was working to complete the transaction quickly, and C5 Accelerate provided two advances to sustain groundTruth.  Id. ¶¶ 92–94, 96–97. PeaceTech alleges that from August to October 2018, Pienaar repeatedly assured PeaceTech that C5 Accelerate was working to complete the transaction imminently.  Id. ¶¶ 102–07, 150.  On October 12, 2018, groundTruth ran out of funding and PeaceTech agreed to fund salaries for groundTruth pending completion of the investment.  Id. ¶¶ 106–08.  But the investment was never completed and groundTruth ceased operations on October 26, 2020.  Id. ¶ 110.  PeaceTech alleges that, in reliance on Pienaar's assurances, it expended $267,082 for groundTruth staff salaries and overhead costs, subleased space to groundTruth for which it "is owed $90,359 in unpaid rent," and is owed an additional "$300,000 from a licensing agreement with groundTruth that PeaceTech would have received had the investment been completed."  Id. ¶¶ 152–54.

Defendants once again seek—at a minimum—to narrow the defendants subject to this claim, this time to only C5 Capital.  Mot. to Dismiss at 16.  The Court agrees that Pienaar is not a proper defendant.  Pienaar signed the term sheet on behalf of C5 Capital, not himself.  Am. Compl. ¶ 84.  Moreover, every email PeaceTech cites is from Pienaar's C5 Capital email address and he repeatedly made clear that he was speaking on behalf of C5 Capital.  See Mot. to Dismiss at 16–18.  For these reasons, and because the Court has concluded that PeaceTech has not sufficiently pled alter ego liability, the Court will dismiss PeaceTech's promissory estoppel claim against Pienaar.

However, PeaceTech has sufficiently alleged that C5 Holdings and GroundTruth Investor are proper defendants.  The Amended Complaint asserts that C5 Holdings was a participant in the investment discussions, attended investor presentations, and provided some of the interim financing while PeaceTech waited for the investment.  Am. Compl. ¶¶ 36, 97.  And PeaceTech

alleges that GroundTruth Investor promised to invest $3.3 million in groundTruth.  Id.  ¶¶ 37, 85.  Thus, PeaceTech has sufficiently alleged that C5 Holdings and GroundTruth Investor were both involved in making the alleged promises that form the basis of PeaceTech's claim for relief.

Defendants also argue that PeaceTech has not sufficiently alleged any promises.  Mot. to Dismiss at 18; Defs.' Reply at 18–20.  "[I]t is a basic tenet of contract law that 'mere expression[] of intention, hope, desire, or opinion, which shows no real commitment, cannot be expected to induce reliance."  CMR D.N. Corp. v. City of Philadelphia, 703 F.3d 612, 634 (3d Cir. 2013) (quoting 3 Corbin on Contracts § 8.9, at 29–30 (Rev. Ed. 1996)).  Defendants correctly highlight that some of the emails PeaceTech presents as evidence of promises do not appear to contain promises at all.  One of the emails, for example, says "[h]ope we can get it over the line today," while another says, "[w]e expect to receive the funds imminently."  Am. Compl. ¶¶ 105, 120.  But PeaceTech does allege that defendants "repeatedly made statements to PeaceTech that funding was forthcoming" and that defendants "would pay the $3 million investment in groundTruth."  Id. ¶¶ 113, 116.  At least some of the email statements PeaceTech presents could constitute promises.  For instance,  Pienaar assured PeaceTech that C5 Capital was "now in a position to move forward to complete the transaction," and later, that money was coming that very day through wire transfer.  Id. ¶ 104, 121–122.  And when PeaceTech said it would need to lay off groundTruth staff if it did not receive the wire that day, Pienaar responded, "[a]s an existing investor with $300k committed in [groundTruth] I really don't understand your message of this morning about laying people off.  I do not understand why you would not avail yourself of our financing to make sure the business remains viable while the seed round completes."  Id. ¶ 107.  The Court may find at a later stage that Pienaar's statements—taken together and in context—do not constitute actionable promises, but only expressions of hope or expectation.   But PeaceTech has alleged that C5 Capital

represented a commitment to completing the investment and has provided statements that could be construed as promises. That is enough to survive a motion to dismiss.

Hence, the Court will deny defendants' motion to dismiss PeaceTech's promissory estoppel claim against C5 Capital, C5 Holdings, and GroundTruth Investor, but will dismiss the claim against Pienaar.

## V.   Breach of Implied Covenant of Good Faith and Fair Dealing

PeaceTech's fourth claim for relief alleges that all defendants breached the implied covenant of good faith and fair dealing in their various interactions with PeaceTech. See Am. Compl. ¶¶ 156–62. Under D.C. law, "all contracts contain an implied duty of good faith and fair dealing." Murray v. Wells Fargo Home Mortg., 953 A.2d 308, 321 (D.C. 2008) (quotation omitted). "[A] party to a contract may be liable for a breach of the duty of good faith and fair dealing if the party evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party." Id. (quotation omitted); see also Himmelstein v. Comcast, 908 F. Supp. 2d 49, 54 (D.D.C. 2012) (bad faith may involve "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance" (quotation omitted)). Here, PeaceTech claims that the Amended Complaint "alleges numerous, specific facts that show bad faith," including that defendants "strung PeaceTech along with false promises," Pl.'s Opp'n at 19; see also Am. Compl. ¶ 114.

To begin, defendants argue that because "a claim for breach of the implied covenant of good faith and fair dealing cannot exist in the absence of a contractual relationship," Busby v. Capital One, N.A., 772 F. Supp. 2d 268, 284 (D.D.C. 2011), only the two defendants who are parties to contracts—Pinard and C5 Accelerate—are proper defendants for this claim. See Mot.

to Dismiss at 12–13.  The other corporate defendants merely planned investments or signed non-binding term sheets, but never entered into binding contracts.  See id.  Pienaar signed contracts, of course, but, as discussed above, only on behalf of Pinard and C5 Accelerate, not in his personal capacity.  Therefore, the Court will dismiss the breach of implied covenant claim against Pienaar, C5 Holdings, C5 Capital, and GroundTruth Investor.

With respect to Pinard and C5 Accelerate, defendants contend that the Amended Complaint does not allege facts to support the elements of a claim for breach of the implied covenant of good faith and fair dealing.  Mot. to Dismiss at 15.  Indeed, PeaceTech's fourth claim for relief merely states that "Defendants materially breached their obligations to PeaceTech as described in this Complaint."  Am. Compl. ¶ 160.  PeaceTech does not point to particular facts in the Amended Complaint that show that Pinard and C5 Accelerate "evade[d] the spirit of the contracts," "willfully rendere[d] imperfect performance," or interfered with performance by PeaceTech.  See Murray, 953 A.2d at 321.  In its opposition, PeaceTech claims that the Amended Complaint does contain facts that show bad faith.  Pl.'s Opp'n at 19.  As evidence, PeaceTech cites paragraphs that supposedly detail "Mr. Pienaar's assertions that the $1.5 million pledge would be completed where he had no intention of doing so" and "Mr. Pienaar's maneuvering to avoid completing the groundTruth investments."  Id. at 19–20 (citing Am. Compl. ¶¶ 63, 65, 84, 91–93, 95–96, 102–05, 109).

But these paragraphs do not contain specific facts that demonstrate bad faith.  PeaceTech merely states that "[o]n information and belief, Mr. Pienaar intended to use his promises to PeaceTech to gain influence and clout in Washington, DC, but did not intend to follow through on his and his companies' obligations to PeaceTech."  Am. Compl. ¶ 65.  This is conclusory.  PeaceTech provides no factual support for its claim that Pinard and C5 Accelerate did not intend

to follow through on their obligations.  Similarly, the paragraphs that purportedly allege Pienaar's "maneuvering" only show that the groundTruth investments were taking a long time to complete, not that Pienaar delayed them in bad faith.  See id. ¶¶ 91–93, 95–96, 102–05, 109.  A claim for breach of the implied covenant of good faith and fair dealing cannot survive a motion to dismiss based on conclusory allegations that a defendant was trying to evade the spirit of the contract.  See Mero v. City Segway Tours of Washington DC, LLC, 826 F. Supp. 2d 100, 107 (D.D.C. 2011) (dismissing breach of implied covenant claim because the plaintiff's conclusory allegation "does not specify how defendants evaded the spirit of the contract, willfully rendered imperfect performance, or interfered with performance by plaintiff" and therefore "does not suffice to state a claim under the standard set forth in Twombly and Iqbal").[2]

The Court accordingly concludes that PeaceTech's breach of implied covenant claim must be dismissed for failure to state a claim upon which relief can be granted.

## VI.    Fraud

PeaceTech's fifth claim for relief alleges that all defendants knowingly made false representations to PeaceTech with the intent to deceive.  See Am. Compl. ¶¶ 163–70.  Common law fraud has five elements: "(1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation."  Ft. Lincoln Civic Ass'n, Inc. v. Ft. Lincoln New Town Corp., 944 A.2d 1055, 1073–74 n.22 (D.C. 2008) (citation omitted).   "[A] party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To meet this standard at the

---

[2] In their reply, defendants also argue that "the law in this district is unsettled as to whether a claim for breach of the implied covenant can lie together with a claim for breach of contract for the same facts."  Defs.' Reply at 15. As defendants note, this Court has previously held that "D.C. law prohibits this Court from forcing [plaintiffs] to choose between the claims at this stage" and maintains that position now.  See Inova Health Care Servs. for Inova Fairfax Hosp. v. Omni Shoreham Corp., Civ. No. 20-784 (JDB), 2020 WL 4201661, at *6 (D.D.C. July 22, 2020).

motion to dismiss phase, a plaintiff must plead with sufficient particularity "the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud" and also "identify individuals allegedly involved in the fraud." United States ex rel. Williams v. Martin–Baker Aircraft Co., 389 F.3d 1251, 1256 (D.C. Cir. 2004) (internal quotation marks and citations omitted).

PeaceTech alleges two categories of false representations—the same two categories presented in the implied covenant claim.  First, PeaceTech alleges that it was fraudulently induced by defendants to enter into agreements that defendants never intended to honor.  See Pl.'s Opp'n at 20; Am. Compl. ¶ 65.  Second, PeaceTech alleges that defendants made false representations to "string PeaceTech along after signing agreements they had no intention of honoring."  See Pl.'s Opp'n at 20; Am. Compl. ¶¶ 113–26.

Defendants first contend, persuasively, that PeaceTech has failed to plead fraud with particularity as required by Rule 9(b).  Mot. to Dismiss at 6–7.  As with PeachTech's fair dealing claim, the only support for PeaceTech's fraudulent inducement claim is that "[o]n information and belief, Mr. Pienaar intended to use his promises to PeaceTech to gain influence and clout in Washington, DC, but did not intend to follow through on his and his companies' obligations to PeaceTech."  Am. Compl. ¶ 65.  This bare allegation lacks "any specifics or evidence of any type that Mr. Pienaar did not intend to follow through."  See Defs.' Reply at 10.  PeaceTech does offer examples of statements that defendants allegedly made to "string PeaceTech along," but does not sufficiently allege that these representations were false, made with knowledge of that falsity, or made with the intent to deceive.  For instance, PeaceTech does not explain what fact was misrepresented in Pienaar's claim on behalf of C5 Capital that "[w]e have an investment transaction that is ready for completion.  Both parties are eager to complete expeditiously."  See

Am. Compl. ¶ 117.   Nor does PeaceTech explain what fact was misrepresented in Pienaar's statement that "[w]e are now in a position to move forward to complete the transaction with a group of US investors," which was followed up by a statement that C5 Capital would not be the lead investor and that additional steps were needed.  See Compl. Ex. 9 [ECF No. 1-9] at 3–4.

Even under a more lenient pleading standard, the Amended Complaint fails to state a claim for fraud.  Because disputes relating to contractual obligations "should generally be addressed within the principles of law relating to contracts," the D.C. Court of Appeals has held that "conduct occurring during the course of a contract dispute may be the subject of a fraud[ ] [claim]" only if (1) "there are facts separable from the terms of the contract upon which the tort may independently rest," and (2) "there is a duty independent of that arising out of the contract itself, so that an action for breach of contract would reach none of the damages suffered by the tort." Choharis v. State Farm and Casualty Co., 961 A.2d 1080, 1087, 1089 (D.C. 2008) (citation omitted).   Neither exception applies here.  The fraud claim alleges only that defendants made false representations related to the agreements at issue, and never actually intended to perform their obligations.  See Am. Compl. ¶¶ 65, 164.  And the remedy for an entity not performing obligations is a breach of contract action.  Thus, this case "falls squarely within the D.C. Court of Appeals' admonition that 'even a willful, wanton or malicious breach of a contract to pay money cannot support a claim of fraud.'" Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC, 13 F. Supp. 3d 62, 67 (D.D.C. 2014) (quoting Choharis, 961 A.2d at 1089).

Therefore, the Court concludes that PeaceTech's fraud claim must be dismissed for failure to state a claim upon which relief can be granted.

## VII.   Personal Jurisdiction

Defendants argue that the Court lacks personal jurisdiction with respect to all defendants

except for C5 Accelerate.  Mot. to Dismiss at 23.  The Court disagrees.

Courts "may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's transacting any business in the District of Columbia."  D.C. Code § 13-423(a)(1).  This provision is "co-extensive with the Constitution's due process limit."  Dickson v. United States, 831 F. Supp. 893, 897 (D.D.C. 1993) (quoting First Chicago Int'l v. United Exch. Co., 836 F.2d 1375, 1377 (D.C. Cir. 1988)).  As a result, "courts in this jurisdiction have consistently held that '[t]he only nexus required by . . . [§13-423] (a)(1) . . . between the District of Columbia and the nonresident defendant is some affirmative act by which the defendant brings itself within the jurisdiction and establishes minimum contacts.'"  Lapointe v. Van Note, 2004 WL 3609346, at *4 (D.D.C. Nov. 9, 2004) (alteration in original) (internal quotation marks omitted) (quoting Berwyn Fuel, Inc. v. Hogan, 399 A.2d 79, 80 (D.C. 1979)).  A party satisfies the minimum contacts requirement by reaching out to do business here that will "require[e] continuing and wide-reaching contacts with the District of Columbia."  Ulico Cas. Co. v. Fleet Nat'l Bank, 257 F. Supp. 2d 142, 146 (D.D.C. 2003) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 480 (1985)).

A.  Andre Pienaar

The Amended Complaint asserts that Pienaar reached out to do business in the District of Columbia, and signed an agreement on behalf of Pinard "requiring continuing and wide-reaching contacts with the District of Columbia"—to fund an accelerator in the District of Columbia.  See id. (finding personal jurisdiction over defendant that entered into contracts requiring activity in the District).  Because the Court has concluded that PeaceTech has sufficiently pled that Pinard is Pienaar's alter ego, this is sufficient to establish specific personal jurisdiction under D.C. Code § 13-423(a)(1).  Further, the Amended Complaint describes several suit-related visits by Mr.

Pienaar to the District of Columbia.  Am. Compl. ¶¶ 31, 34, 38, 102.  These contacts are also sufficient.  See Manifold v. Wolf Coach, Inc., 231 F. Supp. 2d 58, 62 (D.D.C. 2002) (finding personal jurisdiction where defendant engaged in negotiations with representatives of plaintiff in the District through faxes, phone calls, and one meeting in the District).

      B.  Pinard

This Court has specific personal jurisdiction over Pinard under D.C. Code § 13-423(a)(1) because Pinard is a signatory to the Gift Agreement.  Through its representative, Pienaar, Pinard reached out to the District to do business with PeaceTech by contracting to provide funding to PeaceTech in exchange for naming rights over a space located in the District and other benefits. Am. Compl. ¶ 33.  Because the Gift Agreement is a binding contract, it is "business-related" even though it involves a charitable donation, rather than a profit-maximizing investment.  And the Gift Agreement is explicitly subject to D.C. law.  Id.  ¶ 72; see Xenophon Strategies, Inc. v. Jernigan Copeland & Anderson, PLLC, No. CV 15-1774 (RBW), 2016 WL 1367734, at *4 (D.D.C. Apr. 6, 2016) (noting that a D.C. choice-of-law provision is "indicative of purposeful availment").

      C.  C5 Capital

This Court has specific personal jurisdiction over C5 Capital because C5 Capital was a signatory to a Term Sheet and closing documents for an investment in groundTruth.  Although that Term Sheet was not a binding contract, C5 Capital transacted business with PeaceTech through ongoing negotiations regarding its planned investment in groundTruth, which involved regular contacts with the District between 2017 and 2019.  Am. Compl. ¶¶ 36, 82–84. The Amended Complaint alleges that these negotiations involved in-person visits to the District.  Id. ¶ 36. Moreover, C5 Capital has an office in the District, id. ¶ 12, which "constitutes 'regular doing of

business' under the long-arm statute." <u>Nat'l Bank v. Mallery</u>, 669 F. Supp. 22, 27–28 (D.D.C. 1987) (citing <u>Sec. Nat'l Bank, N.A. v. Tauber</u>, 347 F. Supp. 511 (D.D.C. 1972)).

### D.  C5 Holdings

Similarly, this Court has personal jurisdiction over C5 Holdings because C5 Holdings transacted business in the District through its involvement in groundTruth investment negotiations and by providing interim financing to groundTruth.  Am. Compl. ¶ 97.  And like C5 Capital, C5 Holdings has an office in the District.  <u>Id.</u> ¶ 13.

### E.  GroundTruth Investor

Finally, the Amended Complaint sufficiently alleges that this Court has personal jurisdiction over GroundTruth Investor.  PeaceTech alleges that GroundTruth Investor signed a separate agreement with PeaceTech to provide funds for groundTruth.  <u>Id.</u> ¶¶ 37, 85.  And the groundTruth venture was located in the District.

Thus, the Court concludes that it has personal jurisdiction over all defendants.

## **<u>CONCLUSION</u>**

For all the foregoing reasons, defendants' motion to dismiss will be granted in part and denied in part.  The remaining claims, which may proceed to discovery, are as follows: (1) breach of contract against Pienaar and Pinard in connection with the Gift Agreement; (2) breach of contract against C5 Accelerate in connection with the Collaboration Agreement; and (3) promissory estoppel against C5 Capital, C5 Holdings, and GroundTruth Investor in connection with the groundTruth investment.  A separate order will issue on this date.

_____
/s/
JOHN D. BATES
Senior United States District Judge

Dated:  <u>January 12, 2021</u>