# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PEACETECH LAB, INC.,<br>2301 Constitution Ave, NW<br>Washington, DC 20037 | )<br>)<br>)<br>) | |
| Plaintiff, | )<br>) | |
| v. | )<br>) | C.A. No. 1:20-cv-922 (JDB) |
| C5 ACCELERATE LLC, PINARD<br>S.A.R.L., C5 HOLDINGS S.A.R.L.,<br>GROUNDTRUTH INVESTOR LLC,<br>MR. ANDRÉ PIENAAR<br>Suite 460, 1701 Penn Avenue NW,<br>Washington, DC 20006 | )<br>)<br>)<br>)<br>)<br>) | |
| C5 CAPITAL LTD.,<br>7 Vigo Street, London, UK, W1S 3HF | )<br>)<br>) | |
| Defendants. | ) | |

## DEFENDANTS' ANSWER AND COUNTERCLAIMS

Defendants C5 Accelerate LLC ("C5 Accelerate"), Pinard s.a.r.l. ("Pinard"), C5 Holdings s.a.r.l. ("C5 Holdings"), GroundTruth Investor LLC ("GTI"), Mr. André Pienaar, and C5 Capital Ltd. ("C5 Capital"), by and through its undersigned counsel, hereby answers Plaintiff's Amended Complaint (the "Complaint") and submits its Counterclaim against Plaintiff as follows:

In response to the numbered paragraphs and sentences of the Complaint, the Defendants (collectively, unless otherwise noted) admits, denies, or otherwise responds as follows:

1.      No response needed.

2.      Defendants note that this is not an action for fraud as the Plaintiff's abusive and frivolous fraud claim has been dismissed. Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in the second and third sentences of this paragraph.

3.      Denied, except to note that Mr. Pienaar was on the board of Plaintiff's entity for a period of time and that he is an entrepreneur and investor.

4.      Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in the first sentence of this paragraph. Deny the rest.

5.      Denied.

6.      Denied, except to note that C5 Accelerate did enter into a contract with the Plaintiff.

7.      Admit that C5 Capital did execute a term sheet with the Plaintiff, and also signed some closing documents, the nature of which is disputed. Admit that certain of Mr. Pienaar's companies may have planned at one point to potentially invest in groundTruth. Deny the rest.

8.      Denied. The Defendants demand strict proof with respect to any claimed damages.

9.      Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph.

10.     Denied in part and admitted in part. C5 Accelerate is a limited liability company. C5 Accelerate is organized under the laws of Delaware. Denied as to the rest.

11.     Admitted in part. The text in paragraph 11 is admitted. Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in the footnote in paragraph 11.

12.     Admitted in part and denied in part. Admit that C5 Capital is organized and existing under the laws of the United Kingdom. Deny the rest.

13.     Admitted in part and denied in part. Admit that C5 Holdings is a société à responsabilité limitée organized and existing under the laws of Luxembourg. Deny the rest.

14.     Admitted.

15.     Admitted in part and denied in part. Admit that Mr. Pienaar is the founder and Chair of Defendant C5 Capital, is the owner of Defendant Pinard, and is a national and resident of the United Kingdom. Deny the rest.

16.     Admitted as to the nationality of the Defendants. Defendants lack knowledge and information sufficient to form a belief as to the nationality of the Plaintiff.

17.     Denied.

18.     Denied.

19.     Defendants lack knowledge and information sufficient to form a belief as to this paragraph.

20.     Defendants lack knowledge and information sufficient to form a belief as to this paragraph.

21.     Defendants lack knowledge and information sufficient to form a belief as to this paragraph.

22.     Defendants lack knowledge and information sufficient to form a belief as to this paragraph.

23.     Defendants lack knowledge and information sufficient to form a belief as to parts of this paragraph.

24.     Defendants lack knowledge and information sufficient to form a belief as to this paragraph.

25.     Denied.

26.     Denied.

27.     Denied.

28.     Admitted in part. Deny that C5 Accelerate is located in Washington DC.  The address listed in the Collaboration Agreement for C5 Accelerate is the address of the U.S. Institute of Peace, which is not currently C5 Accelerate's address. That address was rented at a premium by C5 Accelerate in connection with the Collaboration Agreement until the Plaintiff breached that Agreement. Deny that C5 Accelerate is currently located in Washington DC.

29.     Admitted in part. C5 Accelerate did negotiate with the Plaintiff. The allegations contained in this paragraph regarding the Collaboration Agreement do not need a response as the Collaboration Agreement speaks for itself. C5 Accelerate admits the last sentence with respect to the manner of negotiations between C5 Accelerate and the Plaintiff. The rest is denied.

30.     Admitted in part and denied in part. Admit that PeaceTech and C5 Accelerate hosted a launch event for the accelerator program in the District of Columbia on April 27, 2017 in which representatives from both C5 Accelerate and Plaintiff were present. Deny the rest.

31.     Admitted.

32.     Denied.

33.     Denied. Plaintiff and Pinard did not "negotiate" the Gift Agreement as such. The allegations contained in this paragraph regarding the Gift Agreement do not need a response as the Gift Agreement speaks for itself.

34.     Admitted in part, except to note that Pinard does not admit to the characterization of "celebratory."

35.     Admitted.

36.     Denied, except to note that the Plaintiff and C5 Capital did negotiate an investment in groundTruth, that C5 Capital did visit Plaintiff regarding this potential investment, and that C5 Capital did negotiate with the Plaintiff through emails and phone calls.

37.     Admitted in part and denied in part. Admit that GTI was represented by Mr. Pienaar and that these negotiations involved emails, phone calls, and in person visits. Deny the rest.

38.     Admit, except to note that Mr. Pienaar objects to the term "frequently," and further notes that he is no longer a member of Plaintiff's Board of Directors.

39.     Denied, except to note that the allegations contained in this paragraph regarding Mr. Pienaar's website do not need a response as his website speaks for itself.

40.     Denied.

41.     Denied.

42.     Denied.

43.     Denied.

44.     Denied.

45.     Denied.

46.     Denied as alleged.

47.     Denied as alleged.

48.     Denied as this allegation appears to be a legal conclusion.

49.     Denied.

50.     Denied. The Defendants further note that the Court dismissed the fraud claim
against all Defendants.

51.     Denied.

52.     Denied, except to note that the Defendants lack knowledge and information
sufficient to form a belief as to what the Luxemburg Business Register showed or did not show.

53.     Denied.

54.     Admitted, except to note that Mr. Pienaar signed the Term Sheet on behalf of C5
Capital.

55.     Denied. With respect to the purported quotes, those quotes to the extent they were
said will speak for themselves and do not show an alter ego relationship.

56.     Denied.

57.     Denied as alleged.

58.     Denied in part and admitted in part. Admit C5 Holdings is the parent company of
C5 Capital and that Pinard also has an ownership interest in C5 Capital. Deny the rest.

59.     Denied.

60.     Denied.

61.     Admitted in part and denied in part. Admit that Pinard entered into a so-called
"Gift Agreement" with the Plaintiff and that Mr. Pienaar signed this agreement, noting that Mr.
Pienaar signed on behalf of Pinard and not in his personal capacity. Deny Plaintiff's
characterization of the Gift Agreement. Admit that none of the Defendants have paid Plaintiff

$1.5 million in connection with the Gift Agreement, noting that none of the Defendants have any liability or obligation to do so at this point.

62.     Admit that C5 Accelerate entered into a "Collaboration Agreement" with Plaintiff and that this agreement was signed by Mr. Pienaar, except to note that Mr. Pienaar signed this agreement as a representative of C5 Accelerate and not in his personal capacity. The allegations contained in this paragraph regarding the Collaboration Agreement do not need a response as the Collaboration Agreement speaks for itself.

63.     Admitted in part and denied in part. Admit that C5 Capital, as represented by Mr. Pienaar, signed a Term Sheet with Plaintiff. The Plaintiff's characterization of that Term Sheet does not require a response as the Term Sheet speaks for itself. Deny the rest.

64.     Denied. With respect to the purported quotes, those quotes to the extent they were said will speak for themselves.

65.     Denied.

66.     Admitted in part and denied in part. Admit that on February 16, 2017, Pinard entered into a Gift Agreement with PeaceTech. Deny the rest as it purports to characterize the Gift Agreement, as the terms of the Gift Agreement speak for themselves.

67.     Admitted in part and denied in part. Admit that Sheldon Himmelfarb, PeaceTech's President and CEO, signed on behalf of PeaceTech and that Mr. Pienaar signed the agreement on behalf of Pinard. Deny the legal characterization regarding alleged consideration. With respect to the rest, the Plaintiff's characterization of the Gift Agreement does not require a response as the Gift Agreement speaks for itself.

68.     Admit, except for the characterization of the $1.5 million as being contracted, which is denied.

69.     Denied.

70.     Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph.

71.     Denied.

72.     Admit regarding the governing law being D.C. law. Admit that Mr. Pienaar signed the Gift Agreement, but note that Mr. Pienaar did so on behalf of Pinard and not in his personal capacity.

73.     Admit that on April 28, 2017, C5 Accelerate entered into a Collaboration Agreement with Plaintiff. With respect to the rest, the Plaintiff's characterization of the Collaboration Agreement does not require a response as the Collaboration Agreement speaks for itself.

74.     Denied as alleged.

75.     The Plaintiff's characterization of the Collaboration Agreement does not require a response as the Collaboration Agreement speaks for itself.

76.     Admitted.

77.     With respect to the first sentence, the Plaintiff's characterization of the Collaboration Agreement does not require a response as the Collaboration Agreement speaks for itself. Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in the last sentence of the paragraph. In any event, the last sentence is denied as this will be a legal determination made by the Court or the jury.

78.     Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph.

79.     Admitted in part and denied in part. Admit the first two sentences. Deny the last sentence.

80.     Denied as alleged.

81.     Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph.

82.     Admitted, except to note that the word multiple means more than one.

83.     Denied.

84.     Admitted in part. The Plaintiff's characterization of the Term Sheet does not require a response as the Term Sheet speaks for itself. Denied in part to the extent that Plaintiff is alleging that the terms of the Term Sheet were binding on the parties.

85.     Denied. The Plaintiff's characterization of what it refers to as an agreement does not require a response as any such document speaks for itself.

86.     Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph.

87.     Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph.

88.     Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph. The Plaintiff's characterization of closing documents does not require a response as the so-called closing documents speak for themselves.

89.     Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph. The Plaintiff's characterization of closing documents does not require a response as the so-called closing documents speak for themselves.

90.    Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph. The Plaintiff's characterization of closing documents does not require a response as the so-called closing documents speak for themselves.

91.    Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph.

92.    Denied as alleged.

93.    Denied as characterized. To the extent this paragraph is based on email communications, such emails would speak for themselves.

94.    Admitted in part and denied in part. Admit that on July 19, 2018, C5 Accelerate provided a SAFE Agreement advance to groundTruth in the amount of $150,000. Deny the rest.

95.    Denied as alleged.

96.    Denied as characterized. To the extent this paragraph is based on email communications, such emails would speak for themselves.

97.    Admitted in part and denied in part. Admit that C5 Holdings made a SAFE Agreement advance on or about August 12 in the amount of $150,000. Deny the rest as characterized.

98.    Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph.

99.    Denied in part and lack information regarding the rest. Deny that Mr. Pienaar made any promises or that the Plaintiff relied on any promises. With respect to the rest, Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph.

100.    Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph.

101.    Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph.

102.    Admitted in part and denied in part. Admit that Mr. Pienaar and Mr. Himmelfarb met on around this date. Deny the rest as characterized and alleged.

103.    Admitted in part. Admit that Mr. Pienaar sent an email on or around that date. With respect to the email, this email speaks for itself.

104.    Admitted in part. Admit that Mr. Pienaar sent an email on or around that date. With respect to the email, this email speaks for itself.

105.    Admitted in part. Admit that Mr. Pienaar sent an email on or around that date. With respect to the email, this email speaks for itself.

106.    Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph.

107.    Admitted. Admit that Mr. Pienaar sent an email on or around that date. With respect to the email, this email speaks for itself.

108.    Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph.

109.    Admitted in part and denied in part. Admit that Mr. Scherer sent an email on or around that date. With respect to the email, this email speaks for itself. Deny that Mr. Scherer requested documentation from Plaintiff solely in order to secure new funding. Rather, Mr. Scherer was concerned about Mr. Himelfarb's and Plaintiff's misuse of the funds that had been provided, as explained below.

110.     Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph.

111.     Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph.

112.     Defendants lack knowledge and information sufficient to form a belief as to the allegations contained in this paragraph.

113.     Denied.

114.     Denied.

115.     Denied.

116.     Denied.

117.     Admitted. Admit that Mr. Pienaar sent an email on or around that date. With respect to the email, this email speaks for itself.

118.     Admitted. Admit that Mr. Pienaar sent an email on or around that date. With respect to the email, this email speaks for itself.

119.     Admitted. Admit that Mr. Pienaar sent an email on or around that date. With respect to the email, this email speaks for itself.

120.     Admitted. Admit that Mr. Pienaar sent an email on or around that date. With respect to the email, this email speaks for itself.

121.     Admitted. Admit that Mr. Pienaar sent an email on or around that date. With respect to the email, this email speaks for itself.

122.     Admitted. Admit that Mr. Pienaar sent emails on or around that date. With respect to the email, this email speaks for itself.

123.     Denied.

124.    Denied.

125.    Denied.

126.    Denied.

127.    Denied.

128.    Denied.

129.    Denied. Defendants lack knowledge and information sufficient to form a belief as to all of the allegations contained in this paragraph.

130.    Denied.

131.    No response necessary, except to reaffirm the denials above.

132.    Denied.

133.    Denied.

134.    Denied.

135.    Denied.

136.    Denied, except to note that Pinard has not made a $1.5 million donation to Plaintiff.

137.    Denied.

138.    Denied.

139.    Denied.

140.    No response necessary, except to reaffirm the denials above.

141.    Defendants lack knowledge and information sufficient to form a belief as to all of the allegations contained in this paragraph.

142.    Denied.

143.    Defendants lack knowledge and information sufficient to form a belief as to all of the allegations contained in this paragraph.

144.    Denied.

145.    Denied.

146.    Denied.

147.    Denied.

148.    Denied.

149.    No response necessary, except to reaffirm the denials above.

150.    Denied.

151.    Denied.

152.    Denied.

153.    Denied.

154.    Denied.

155.    Denied.

156.    No response necessary as claim dismissed.

157.    No response necessary as claim dismissed.

158.    No response necessary as claim dismissed.

159.    No response necessary as claim dismissed.

160.    No response necessary as claim dismissed.

161.    No response necessary as claim dismissed.

162.    No response necessary as claim dismissed.

163.    No response necessary as claim dismissed.

164.    No response necessary as claim dismissed.

165.    No response necessary as claim dismissed.

166.    No response necessary as claim dismissed.

167.    No response necessary as claim dismissed.

168.    No response necessary as claim dismissed.

169.    No response necessary as claim dismissed.

170.    No response necessary as claim dismissed.

171.    The Defendants deny damages claimed by the Plaintiff and demand strict proof of any such damages amounts.

## Affirmative Defenses

### First Affirmative Defense – Failure to State Claim

172.    Plaintiff's Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense – Failure to Mitigate Damages

173.    Plaintiffs have failed to mitigate damages, to the extent any damages are due, which is denied.

### Third Affirmative Defense – Estoppel

174.    Plaintiff is estopped from bringing any claims for breach of contract because Plaintiff has not complied with its obligations under those agreements.

### Fourth Affirmative Defense – Lack of Consideration

175.    The Gift Agreement is not enforceable due to a lack of consideration.

176.    The Term Sheet is not binding due to, among other reasons, a lack of consideration.

177.    The closing documents are not binding due to, among other reasons, a lack of consideration.

Fifth Affirmative Defense – Fraud

178.    The Defendants are excused from any performance based on the Plaintiff's fraud. The Defendants are further excused from any liability under a promissory estoppel claim as a result of fraud by the Plaintiff and its representatives.

Sixth Affirmative Defense – Accord and Satisfaction

179.    Any obligation under the Gift Agreement, if it exists, has been discharged due to accord and satisfaction.

Seventh Affirmative Defense – Frustration of Purpose

180.    The Defendants have no obligations under the Gift Agreement or Collaboration Agreement because the Plaintiff frustrated the purpose of both of those agreements.

Eighth Affirmative Defense – Unclean Hands

181.    The Plaintiff is not entitled to promissory estoppel relief or any equitable relief because the Plaintiff has unclean hands.

Ninth Affirmative Defense – Statute of Limitations

182.    The Defendants invoke the statute of limitations with regard to all claims.

183.    In particular, the Plaintiff is not entitled to claim for breach of the Gift Agreement as the claim was brought more than three years after the claim accrued.

Tenth Affirmative Defense – Plaintiff's Breach

184.    The Plaintiff is not entitled to claim for breach under any agreements as the Plaintiff breached those agreements.

Eleventh Affirmative Defense – Quantum Meruit and Unjust Enrichment

185.    The Plaintiff is not entitled to claim for amounts for which it has been unjustly enriched or which it has not paid pursuant to services received.

Twelfth Affirmative Defense – Prevention of Performance

186.    The Plaintiff prevented performance by certain of the Defendants and thus the Defendants cannot claim lability for any alleged non-performance.

Thirteenth Affirmative Defense – Failure of Condition Precedent

187.    The Plaintiff cannot claim a breach by the Defendants when the Plaintiff failed to satisfy a condition precedent to that performance.

## Counterclaims

188.    C5 Accelerate, C5 Holdings, and C5 Capital (collectively, "C5") assert counterclaims, as set out below, based on information currently available. All of the Defendants reserve the right to assert additional counterclaims as discovery proceeds.

189.    The failure of the business relationships between the Plaintiff and C5 lies solely with the Plaintiff and its representatives.

Collaboration Agreement

190.    C5 made substantial investments (approximately $5 million in total) in connection with the accelerator program, described below.

191.    In connection with these investments, C5 Accelerate entered into a Collaboration Agreement with the Plaintiff. (Plaintiff's Exhibit 2.)

192.    The purpose of the Collaboration Agreement was to support a startup company accelerator with a mission focused on facilitating innovation in peace technology (the "Program").

193.    The Collaboration Agreement had a clear delineation of obligations between the parties. C5 Accelerate was to provide funding, as set out in the Collaboration Agreement and as

agreed by the parties, to the Plaintiff. In return, the Plaintiff was obligated to support the Program in **all aspects**, which included recruiting entities to join the Program.

194.     Specifically, the Collaboration Agreement obligated the Plaintiff to "use commercially reasonable efforts support Accelerator in all aspects of the Program . . . ." This included recruiting entities for the Program, helping to build relationships with innovation partners, and using its marketing channels and network to support the Program.

195.     Put simply, the Plaintiff was obligated to ensure all aspects of the Program were successful, which included marketing and building relationships.

196.     In furtherance of the goals and spirit of the Collaboration Agreement, PeaceTech elected Mr. Pienaar to its board of directors in September 2017.

197.     When PeaceTech elected Mr. Pienaar to its board, Plaintiff noted that Mr. Pienaar was a "prominent expert[]". In a foretelling of the dispute to come, Mr. Pienaar noted in joining the PeaceTech board the need for "transparency and accountability". Mr. Pienaar further noted that corruption erodes the public trust.

198.     C5 Accelerate complied with its obligation under the Collaboration Agreement by making a payment of $160,000 in 2017.

199.     The Plaintiff, in contrast, did not fulfill any of its obligations under the Collaboration Agreement. As one example, the Plaintiff was specifically obligated to make commercially reasonable efforts to recruit entities (meaning startups) into the Program. The Plaintiff failed to do so, and likewise failed to make commercially reasonable efforts to do so.

200.     Similarly, the Plaintiff failed to take commercially reasonable efforts with respect to its other obligations.

201.     The Plaintiff did not help to build relationships with innovation partners.

202.     The Plaintiff did not use its marketing channels and network to support the Program in a commercially reasonable manner.

203.     In fact, to the contrary and as explained below, the Plaintiff demolished those marketing channels and fractured relationships with entities that could have supported the Program.

204.     The breaches of the Collaboration Agreement laid out above were significant. But an even more fundamental issue with the Collaboration Agreement was the lack of transparency and accountability by Plaintiff's CEO and Board Chair.

205.     After C5 Accelerate began to provide funding in connection with the Collaboration Agreement, C5 Accelerate also demanded (appropriately) transparency and accountability with respect to those funds.

206.     C5 Accelerate made requests to Plaintiff's management to provide information on how the money provided was spent.

207.     C5 Accelerate became concerned when Plaintiff failed to provide such information. These were simple requests for information about where and how money was being spent that C5 Accelerate had provided. The failure of the Plaintiff's management to provide this information was beyond alarming.

208.     At the time that C5 Accelerate was making these repeated requests for information to Plaintiff's management and use of funds, including to Plaintiff's CEO Sheldon Himelfarb, Mr. Pienaar was a board member of Plaintiff. As a board member, Mr. Pienaar also made repeated requests for transparency with respect to the spending of Plaintiff. Despite requests from a board member, whose company had provided substantial funding, the Plaintiff did not provide information about where and how it was spending this money.

209.    In fact, Mr. Pienaar attended four Board meetings before he was illegally ousted, and Plaintiff's financials were not presented in those meetings.

210.    As a Board member, Mr. Pienaar was concerned about more than just the lack of information and transparency regarding the funding provided by C5 Accelerate. Mr. Pienaar was also concerned with the spending generally of the Plaintiff. Mr. Pienaar was troubled by the lack of accountability and information provided to the Board regarding such spending. Mr. Pienaar raised these concerns several times to the board chair, Nicholas Donofrio.

211.    Mr. Pienaar and C5 Accelerate's efforts to obtain accountability and transparency from the PeaceTech Labs failed. Mr. Donofrio and Mr. Himelfarb refused to provide information. This greatly added to the concern of the C5 entities and Mr. Pienaar.

212.    What came next was unfortunately worse. Rather than provide the requested information, Mr. Pienaar was illegally removed from the board.

213.    Upon information and belief, Mr. Donofrio, in connection with Mr. Himelfarb, sought to oust Mr. Pienaar from the PeaceTech board because of his repeated inquiries into the use of funds.

214.    Mr. Donofrio convened a meeting without reasonable notice in violation of the board's bylaws. Mr. Pienaar was wrongfully excluded from this meeting even though he was a board member at the time of this meeting. Mr. Pienaar was also prevented from providing information or evidence at this meeting. Upon information and belief, at this meeting Mr. Donofrio sought to remove Mr. Pienaar from the board. Without any accountability from Plaintiff, and in violation of the board's bylaws, Mr. Pienaar was subsequently removed from the board over his objection.

215.     Just days before this irregular board meeting, Mr. Pienaar wrote to Mr. Donofrio noting that he (Mr. Pienaar) had raised "serious questions about the application of funds" by PeaceTech Labs. Mr. Pienaar further noted that he had repeatedly requested a meeting with Mr. Donofrio and Mr. Himelfarb regarding these serious questions and that none of these questions had been resolved. Rather than resolving these serious questions about the use of funds, Mr. Pienaar was removed from the board in a manner that was shrouded in secrecy and lacked transparency.

216.     The Plaintiff is a non-profit entity.

217.     The Plaintiff's parent entity, the U.S. Institute of Peace ("USIP"), is a federally funded entity, making it part of the public trust.

218.     The failure of a non-profit entity, funded by the federal government, to respond to serious questions regarding the use of funds, and to provide transparency and accountability to a board member and also a funder, is quite telling. To this day, Mr. Donofrio and Mr. Himelfarb have still not provided the accountability and information requested by C5 and Mr. Pienaar.

219.     The failure to provide information about the use of funds is all the more problematic in that this failure was the basis, in part, of a delay in funding from C5 Accelerate. The parties to the Collaboration Agreement had agreed that any amounts due would be invoiced by Plaintiff, along with a statement of work prepared by Plaintiff.

220.     Prior to the illegal removal of Mr. Pienaar from the board, the Plaintiff had not invoiced C5 Accelerate for amounts due and, importantly, had also not provided a statement of work, despite the submission of this being necessary for payment. Consequently, C5 Accelerate had not made any additional payments under the Collaboration Agreement.

221.    By the time that the Plaintiff did send an invoice, Mr. Pienaar had already been illegally ousted from the board. This ouster was in further breach of the Collaboration Agreement, as Plaintiff was obligated to – among other things – build relationships and use marketing channels in support of the Program.

222.    In addition to the ouster of the Mr. Pienaar, Plaintiff's continued breaches of the Collaboration Agreement (described above) proved too much.  Plaintiff was essentially performing no meaningful obligations on its side. The Plaintiff's material breaches relieved C5 Accelerate from any further obligations it had under the Collaboration Agreement.

223.    The damage caused by Plaintiff's breach of the Collaboration Agreement were significant. C5 Accelerate had invested approximately $5 million in the Program, in addition to the wasted time and resources. In addition, the illegal manner in which Mr. Pienaar was removed from the board caused additional damage.

224.    Had the Plaintiff complied with its obligations under the Collaboration Agreement, the Program would have resulted in startups providing equity for participating in the Program, resulting in substantial profits for C5 Accelerate.

SAFE ADVANCES

225.    C5 and the Plaintiff also signed a non-binding term sheet ("Term Sheet") for investments into an entity called groundTruthglobal ("GTG").

226.    The Plaintiff's Amended Complaint makes all manner of false assertions regarding the Term Sheet and the planned investments. The Defendants reject all of those assertions.

227.    This Term Sheet expressly states that it is non-binding.

228.     As with the Collaboration Agreement, the Plaintiff's actions and inactions led to the failure of this planned investment, as described below.

229.     The planned investment was not to be led by C5 Capital or any of the Defendants. To the contrary, C5 Capital representatives had stated on numerous occasions that they were not going to be the lead investor. The Term Sheet itself states that C5 Capital would be acting for third party investors, not on its own behalf.

230.     Because C5 Capital would be managing investments on behalf of third parties, C5 Capital had to make sure to take steps to protect any investors.

231.     C5 Capital had several concerns that arose after the Term Sheet was signed. One such concern was the continued refusal of Mr. Himelfarb and Mr. Donofrio to provide information about funding that had been provided already to Plaintiff.

232.     Another concern arose with apparent and potential conflicts of interest.

233.     One such potential conflict of interest arose when C5 Capital learned that the U.S. Department of Defense had funded the development of the intellectual property that was to be licensed to GTG by the Plaintiff.

234.     The main financing agreement (the "SPA") included an express covenant that the intellectual property ("IP") licensed to or held by the issuer, GTG, was not developed by the government. GTG represented that "[n]o government funding … or funding from third parties was used in the development of any Company Intellectual Property."

235.     This representation that no government funding was involved in the development of the IP in question was also made several times by Plaintiff's officials. As one of many examples, Plaintiff's CEO Mr. Himelfarb represented at Plaintiff's board meeting on July 11,

2018 that the government was not involved in the development of the IP and had no role in funding it.

236.    C5 Capital relied on these repeated representations when proceeding with the transaction. C5 Capital would not have spent one dime in furtherance of this potential investment and transaction had Plaintiff disclosed that government funding was involved in the development of the IP.

237.    The Plaintiff was aware that C5 Capital was relying on this representation regarding the lack of government funding.

238.    The representation turned out to be false as the Department of Defense ("DoD") had funded the development of the IP.

239.    C5 Capital confirmed the DoD's involvement in funding the IP as a result of enhanced due diligence conducted by C5 Capital's lawyers after all the deal negotiations were completed. Mr. Himelfarb had represented otherwise and never corrected these false representations.

240.    C5 Capital later learned that the Plaintiff had received approximately $217,000 in funding from the DoD for the development of the intellectual property that GTG claimed did not involve the government. The DoD provided the funding to the Plaintiff through a contract vehicle that was an interagency agreement with the USIP. The USIP made the Plaintiff a "subcontractor" so that USIP could provide the $217,000 in funds from the DoD to the Plaintiff. The program from which the funding was given was called "GroundTruth for Open Information Exchange".

241.    In addition to the representation and covenant in the SPA, as stated above, both the Chair and CEO of Plaintiff warranted several times to C5 Capital that the intellectual

property for GTG received no U.S. Government funding. This false assertion was also made at the Plaintiff's board meeting where approval was being sought to enter into the transaction, as discussed above.

242.    When C5 Capital confronted the Plaintiff with information showing that the DoD was involved and had even provided substantial funding in connection with the development of the intellectual property, the CEO of the company Mr. Himelfarb would not admit this fact.

243.    Instead, Mr. Himelfarb provided a questionable document that sought to obfuscate the DoD's role in the development of the intellectual property. But even that document showed that the DoD had provided funding. Despite this document, Mr. Himelfarb and the Plaintiff continued to falsely represent that the DoD had not provided the funding. Mr. Himelfarb stated that he was preparing other material that would explain the situation and show that the DoD did not fund the development of the IP. Mr. Himelfarb still claimed to be preparing this explanation when the C5 entities provided the two SAFE advances. The C5 entities would not have provided these SAFE advances had Mr. Himelfarb not continued to represent that the DoD had in fact not provided the relevant funding.

244.    In any event, the Defendants know now that Mr. Himelfarb's assertions and excuses were false and that the DoD did provide such funding.

245.    The discovery and later confirmation of the DoD's funding of the intellectual property of GTG created significant difficulties for the planned investment. Investors would now be investing in an entity that was connected with the federal government, rather than solely with GTG. Any relationships between these investors and current or former government officials, would create significant issues, including alleged conflicts of interest. Also, entering into an

investment where the federal government has an interest, directly or indirectly, could be problematic for investors for a variety of reasons.

246.     The planned investment in GTG was a for-profit enterprise. It is beyond problematic to invest in a for profit venture where the DoD has provided the funding to develop the enterprise's sole asset – the IP. This changed fundamentally the entire nature of the planned investment.

247.     The potential issues outlined above in light of the DoD involvement is indeed what occurred. Allegations (false ones) were made about conflicts of interests with the DoD and potential investors regarding this planned investment.

248.     To be clear, the work that the C5 entities had done in furtherance of the GTG project, and the money that was spent in furtherance of the planned investment, was done either before C5 learned of the DoD's involvement or at a time when Plaintiff was still denying it and stating its intention to provide additional information.

249.     At the time that the C5 entities provided the SAFE advances the Plaintiff still claimed that the DoD had not provided such funding.

250.     When C5 Accelerate provided an advance of $150,000 in July 2018 that was supposed to be used for GTG, the Plaintiff still maintained that the DoD did not fund the development of the IP.

251.     Likewise, when C5 Holdings likewise provided an advance of $150,000 in August 2018 that was supposed to be used for GTG, the Plaintiff still maintained that the DoD did not fund the development of the IP.

252.     Plaintiff, through its principals Mr. Himelfarb and Rohini Srihari, knew however that the representations regarding the lack of government funding were false. Mr. Himelfarb

claimed that he and Professor Srihari had developed the IP. So, Mr. Himelfarb puts himself directly into the development of the IP, meaning that he knew that government funding was involved. In any event, as the CEO, he would have known of the DoD funding.

253.     Upon information and belief, Mr. Himelfarb kept the existence of the DoD funding a secret because he was to receive equity in the new entity based on his alleged contribution to the IP. Upon information and belief, Mr. Himelfarb was to obtain substantial equity (or did obtain equity) in GTG for his alleged involvement in the development of the IP. Had Mr. Himelfarb disclosed the DoD funding, C5 Capital would not have pursued the venture. This gave Mr. Himelfarb incentive to hide the DoD involvement. In addition, the Plaintiff would have received revenue had the transaction closed. This gave the Plaintiff additional cause to make false representations about this material fact.

254.     Because of these false representations, which the C5 entities relied upon, and which continued through the provision of the SAFE advances, the C5 entities expended substantial amounts of money, including the $300,000 from the SAFE advances.

255.     In any event, the Plaintiff's use or misuse of those SAFE advances is also in question. Upon information and belief, the Plaintiff diverted and comingled the funds from the SAFE advances, such that some of the funds were used to advance the Plaintiff's interests.

256.     Although the Plaintiff provided some information regarding the use of these funds, this information was woefully incomplete. And the Plaintiff refused to substantiate any of the amounts.

257.     In addition, this information regarding the use of the funds referred to a line item "executive expenses." These expenses were significant. C5 Capital requested information as to

what the executive expenses were, but Plaintiff refused to provide this information. The Plaintiff also refused to provide any receipts for these so-called executive expenses.

258.     Given that GTG was operating in the same location and using the same resources as Plaintiff, there is no justification for such a high level of executive expenses for this project.

### Count One – Breach of the Collaboration Agreement (C5 Accelerate)

259.     C5 Accelerate restates and re-alleges all of the foregoing paragraphs of this Answer and Counterclaims as though fully set forth herein.

260.     The Plaintiff breached the Collaboration Agreement in the manner stated above.

261.     The Plaintiff's breaches of the Collaboration Agreement were material. In fact, the Plaintiff breached all of its obligations under the Collaboration Agreement.

262.     The Plaintiff's material breaches of the Collaboration Agreement occurred prior to Plaintiff's providing an invoice and statement of work for payment under the Collaboration Agreement.

263.     The material breaches by Plaintiff led directly to the loss of C5 Accelerate's substantial investments in the Program, which investments being approximately $5 million.

264.     The material breaches by Plaintiff likewise deprived C5 Accelerate of the equity it would have received from these startup entities.

265.     As such, C5 Accelerate seeks damages from Plaintiff in an amount to exceed $5 million.

### Count Two – Breach of Contract (C5 Accelerate and C5 Holdings)

266.     C5 Accelerate and C5 Holdings restate and re-allege all of the foregoing paragraphs of this Answer and Counterclaims as though fully set forth herein.

267.   C5 Accelerate provided an advance of $150,000 in order to further the planned investment into GTG.

268.   C5 Holdings provided an advance of $150,000 in order to further the planned investment into GTG.

269.   These advances have not been repaid.

270.   Nor has any other consideration been provided to C5 Accelerate and C5 Holdings for the use of these funds.

271.   The involvement of the C5 entities in the planned investment was on the basis of GTG's representation that no government involvement existed with respect to the intellectual property.

272.   It was later discovered that in fact the federal government had been involved in the development of the intellectual property.

273.   The Plaintiff is liable for these SAFE advances because the Plaintiff is the alter ego of GTG.

274.   Upon information and belief, GTG and the Plaintiff comingle their finances.

275.   Upon information and belief, GTG and the Plaintiff are managed by the same individuals.

276.   Upon information and belief, the Plaintiff manages and controls every aspect of GTG and that GTG has no personality or will of its own.

277.   Upon information and belief, GTG and the Plaintiff employ several of the same persons, if not all of the same persons.

278.   Upon information and belief, GTG and the Plaintiff share the same address.

279.   Upon information and belief, GTG and the Plaintiff share the same office space.

280.     Upon information and belief, Plaintiff has siphoned funds that were supposed to be for the use of GTG.

281.     Upon information and belief, the Plaintiff undercapitalized GTG. The Plaintiff purchased 1,000,000 shares of GTG for $100 (one hundred dollars) in June 2018.  Upon information and belief, Plaintiff gave thousands of shares to certain of its representatives without proper consideration.

282.     As the alter ego, the Plaintiff is liable for repayment of the SAFE advances.

283.     The Plaintiff is liable to C5 Accelerate and C5 Holdings for $300,000 for repayment of the SAFE advances.

## Count Three – Fraudulent Misrepresentation
## (C5 Capital, C5 Accelerate, and C5 Holdings)

284.     C5 Capital, C5 Accelerate, and C5 Holdings restate and re-allege all of the foregoing paragraphs of this Answer and Counterclaims as though fully set forth herein.

285.     The Plaintiff made fraudulent misrepresentations to C5 Capital, C5 Accelerate, and C5 Holdings ("C5").

286.     Specifically, the Plaintiff's CEO, Sheldon Himelfarb, told C5's owner, Andre Pienaar, that the intellectual property that the Plaintiff was going to license to GTG was developed without any government funding. Mr. Himelfarb made this fraudulent representation on several occasions to Mr. Pienaar.

287.     As one example, in Plaintiff's board meeting on July 11, 2018, Plaintiff's representatives repeated this fraudulent representation that no government funding was used for the development of the intellectual property.

288.     This fraudulent representation was material and significant. The fact, learned later by C5, that the DoD funded the development of the intellectual property was of great importance in that it was a significant obstacle to raising the investments needed for the project.

289.     The Term Sheet, although not binding, referred to $3 million that would have been invested. The Term Sheet further noted that C5 Capital would be managing investments from third parties for this project.

290.     The fraudulent misrepresentation put C5 at risk in that it would not be disclosing this DoD funding to the investors.

291.     More importantly, the existence of the DoD funding changed the entire nature of the project. With the DoD's involvement, the investors would potentially be subject to conflict of interest allegations, real or perceived.

292.     C5 would not have expended the money it did in furtherance of the project had it known of the DoD's involvement from the beginning. C5 Capital would have never begun negotiations or signed the Term Sheet.

293.     The Plaintiff knew these statements were false when made. The same persons who made these false statements were involved in the development of the intellectual property and were expressly aware that the DoD was funding this development.

294.     The Plaintiff intended to deceive C5 in order to gain a business opportunity and to receive investments that it otherwise would not have had access to.

295.     The Plaintiff would have tried to keep this fact hidden. But C5's outside counsel discovered it in enhanced due diligence.

296.     C5 relied on the Plaintiff's representation when expending money in furtherance of the project.

297.     Although C5 continued to expend money even after learning this information, this was necessary because C5 had already spent substantial amounts in pursuit of the project. But C5 would not have spent a dime on the project had it known of the DoD's involvement from the beginning.

298.     The damages caused by this fraudulent misrepresentation include the substantial professional fees and other costs that C5 Capital spent in furtherance of this project, as well as the two SAFE advances.  The Term Sheet provided that C5 Capital would be reimbursed for its expenses, both internal and external, once the transaction had closed. C5 Capital is entitled to those reimbursements because of the Plaintiff's fraudulent misrepresentations.

299.     The Plaintiff is also liable as the alter ego of GTG for the representation and covenant in the SPA that government funding was not involved in the development of the intellectual property. This representation was put in by officials from Plaintiff, even though the representation was technically made by GTG.  So the Plaintiff is liable for the fraudulent misrepresentations made by GTG as well.

### Count Four – Negligent Misrepresentation
### (C5 Capital, C5 Accelerate, and C5 Holdings)

300.     C5 Capital, C5 Accelerate, and C5 Holdings restate and re-allege all of the foregoing paragraphs of this Answer and Counterclaims as though fully set forth herein.

301.     C5 maintains that the Plaintiff made fraudulent misrepresentations to C5 Capital, C5 Accelerate, and C5 Holdings.

302.     Alternatively, at a minimum, the Plaintiff made negligent misrepresentations to C5 Capital, C5 Accelerate, and C5 Holdings for the reasons outlined in Count Three above.

303.   The Plaintiff knew or should have known that the repeated false assertion that government funding was not used in the development of the IP. The Plaintiff's representatives who made those false statements knew and were involved in the government funding for the IP.

304.   C5 relied on the Plaintiff's false representation, or negligent misrepresentation when expending money in furtherance of the project.

305.   The damages caused by this fraudulent misrepresentation include the substantial professional fees and other costs that C5 Capital spent in furtherance of this project, as well as the two SAFE advances.

### Count Five – Quantum Meruit / Unjust Enrichment (C5 Accelerate and C5 Holdings)

306.   C5 Accelerate and C5 Holdings restate and re-allege all of the foregoing paragraphs of this Answer and Counterclaims as though fully set forth herein.

307.   C5 Accelerate provided an advance of $150,000 in order to further the planned investment into GTG.

308.   C5 Holdings provided an advance of $150,000 in order to further the planned investment into GTG.

309.   Upon information and belief, the Plaintiff diverted some or all of these funds for the use of Plaintiff.

310.   These advances have not been repaid.

311.   Nor has any other consideration been provided to C5 Accelerate and C5 Holdings for the use of these funds.

312.   C5 Accelerate and C5 Holdings are entitled to damages for the Plaintiff's alleged use of these funds up to $300,000.

### Count Six – Accounting (C5 Accelerate)

313.    C5 Accelerate restates and re-alleges all of the foregoing paragraphs of this Answer and Counterclaims as though fully set forth herein.

314.    C5 Accelerate provided substantial funding to Plaintiff in connection with the Collaboration Agreement, and the related transaction.

315.    C5 Accelerate has requested on multiple occasions an accounting showing the uses of these funds.

316.    The Plaintiff has repeatedly refused to provide such accounting.

317.    The Plaintiff is in a position of trust with respect to C5 Accelerate. Among other things, upon information and belief, the Plaintiff was holding the funds for GTG and acting as an agent for the GTG funds. The Plaintiff was also obligated to provide such information with respect to the Collaboration Agreement.

318.    The Plaintiff is liable to provide an accounting for those funds provided by C5 Accelerate, as well as the other C5 entities.

**PRAYER FOR RELIEF**

WHEREFORE, the Defendants respectfully request:

    a.  damages from count one in an amount to exceed $5 million, plus interest;

    b.  damages from count two of $300,000, plus interest;

    c.  damages from count three in an amount to be determined at trial, plus interest;

    d.  damages from count four in an amount to be determined at trial, plus interest;

    e.  damages from count five of $300,000, plus interest;

    f.  an accounting of the funds provided to the Plaintiff by the Defendants;

g.   attorneys' fees and costs; and

h.   other relief as is just and proper, as this Court may allow and so rule.


Respectfully submitted,

By: */s/ Edward Baldwin*

STEPTOE & JOHNSON
1330 Connecticut Avenue NW
Washington, DC 20036
Tel: (202) 429-3000
Fax: (202) 429-3902
Email: ebaldwin@steptoe.com

Dated: January 26, 2021

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 26, 2021, I electronically filed the foregoing documents with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: <u>*/s/ Edward Baldwin*</u>